UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA MAYS, *et al*.,

               Plaintiffs,

vs.

JEFF WRIGHT, in his official and individual capacity, *et al*.,

               Defendants.

Case No.: 5:15-cv-14002-JCO-MKM

Honorable:  John Corbett O'Meara
Magistrate Judge:  Mona K. Majzoub

---

## DEFENDANT JEFF WRIGHT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. PRO. 12(b)(6)

Defendant Jeff Wright respectfully moves this Court to dismiss all of Plaintiffs' claims asserted against him under Fed. R. Civ. Pro. 12(b)(6), applying Fed. R. Civ. P. 8(a)(2), because Plaintiffs' First Amended Complaint ("FAC") failed to provide this Court with a short and plain statement of the claims showing that they are entitled to relief against Wright.

1.     Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiffs' FAC must allege sufficient facts, accepted as true, to state a claim for relief which is plausible on its face. *Twombly*, *supra* at 570. The FAC as to Wright does not state facts which suggest that Plaintiffs are plausibly entitled to relief against him.

2.     Plaintiffs assert five claims against Wright:   (1) Violation of Substantive Due Process for a State Created Danger; (2) Violation of Substantive Due Process Relative to Bodily Integrity; (3) Violation of Equal Protection Clause of the U.S. Constitution Based on Race and Wealth; (4) Violation of 42 U.S.C. §1985(3) for Conspiracy to Violate Plaintiffs' Constitutional Rights; and (5) Violation of Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") for Denial of Full and Equal Enjoyment of Public Services Based on Race.

3.     Plaintiffs' Substantive Due Process Claims – state created danger and bodily integrity – do not state facts showing Wright did anything to create a danger to Plaintiffs or to violate their bodily integrity.  Plaintiffs refer to Wright only in blanket references to "all defendants" in these claims.  The two claims do not assert any factual matter specifically as to Wright and, therefore, fail to state a plausible claim for relief against him.

4.     Plaintiffs' Equal Protection claims assert that because Wright allegedly knew that the Flint River was "inferior" to the cleaner water provided by the Detroit Water and Sewerage Department, he intentionally devised a plan to deliver River water to low income African-American Flint residents, and deliver clean Lake Huron water to the wealthy, white County residents to discriminate against Flint residents based on their race and their wealth.  Plaintiffs' claims fail for multiple independent reasons:

2

a.      Income or wealth is not a recognized protected class subject to equal protection. *Maher v. Roe*, 432 U.S. 464, 470-71 (1977). Therefore, wealth cannot form the basis of an equal protection claim.

b.      Plaintiffs' allegations that Flint residents were treated differently based on their race is parallel to the conclusory allegations in *Iqbal, supra*.  As in *Iqbal*, Plaintiffs do not provide adequate factual material to plausibly suggest they are entitled to relief against Wright.

c.      Plaintiffs do not allege that Flint and Genesee County residents are similarly situated and they are not.  Flint is uniquely positioned to use the Flint River as its primary water supply because it has a water treatment plant on the River, has permits to take water from the River, and operates its own water system.  On the other hand, Genesee County cannot use the River for its primary water supply.  The County has no water treatment plant, has no permits to remove water from the River and is not a part of the Flint system.  The County has its own independent water system.  Plaintiffs have not and cannot show residents of Flint and Genesee County are similarly situated.  Plaintiffs' equal protection

claims should be dismissed pursuant to Fed. R. Civ. Pro. 12(b)(6) and *Iqbal, supra.*

5.     Plaintiffs' claim asserting a conspiracy to violate Plaintiffs' constitutional rights in violation of 42 U.S.C. §1985(3) offers no factual support, and mirrors the statutory language in 42 U.S.C. §1985(3).  Therefore, this claim should be dismissed pursuant to Fed. R. Civ. Pro. 12(b)(6) and *Iqbal, supra.*

6.     Plaintiffs' ELCRA claim does not plead facts demonstrating that Flint and Genesee County residents were similarly situated in all material respects.  As noted, Flint and County residents receive water service from two different independent water systems.  Accordingly, it is next to impossible for Plaintiffs to show that the residents of Flint and Genesee County are similarly situated in support of this claim.  Therefore, this claim should be dismissed pursuant to Fed. R. Civ. Pro. 12(b)(6) and *Iqbal, supra.*

7.     As to all the claims discussed herein, Plaintiffs' FAC as to Wright should be dismissed under Fed. R. Civ. P. 12 (b)(6) applying Fed. R. Civ. P. 8(a)(2), because Plaintiffs have not pleaded facts, which if true, plausibly suggest they are entitled to relief against him on any asserted basis.

8.     There was a conference between counsel for Plaintiffs and counsel for Wright in which counsel for Wright explained the nature of this Motion and its

legal bases and requested, but did not obtain, concurrence in dismissal of the claims.

WHEREFORE, for the reasons set forth above and more fully in the brief supporting this Motion, Defendant Jeff Wright respectfully requests that this Court grant his Motion and dismiss all claims against him contained in Plaintiffs' First Amended Complaint with prejudice.

Respectfully submitted,

GENESEE COUNTY DRAIN COMMISSIONER'S OFFICE

s/Joseph F. Galvin
JOSEPH F. GALVIN (P13821)
Attorney for Defendant Jeff Wright
4610 Beecher Road
Flint, MI  48532
(810) 732-7870
jgalvin@gcdcwws.com

McGRAW MORRIS P.C.

s/Thomas J. McGraw
THOMAS J. MCGRAW (P48817)
KEVIN K. KILBY (P68599)
STACY J. BELISLE (P59246)
2075 W. Big Beaver Road, Ste. 750
Troy, MI  48084
248-502-4000

Dated:  August 1, 2016

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA MAYS, *et al.*,

                 Plaintiffs,

vs.

JEFF WRIGHT, in his official and individual capacity, *et al.*,

                 Defendants.

Case No.: 5:15-cv-14002-JCO-MKM

Honorable:  John Corbett O'Meara
Magistrate Judge:  Mona K. Majzoub

---

## DEFENDANT JEFF WRIGHT'S BRIEF IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. PRO. 12(b)(6)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

E.D. MICH. LR 7.1(d)(2) CONCISE STATEMENT OF ISSUES
PRESENTED ............................................................................................. iv

I. DOES PLAINTIFFS' FIRST AMENDED COMPLAINT, AS TO DEFENDANT WRIGHT, CONTAIN SUFFICIENT FACUTAL MATERIAL, TAKEN AS TRUE, TO PLAUSIBLY SUGGEST THAT GROUNDS EXIST FOR PLAINTIFFS' ENTITLEMENT TO RELIEF AGAINST DEFENDANT WRIGHT? ........................................... iv

E.D. MICH. LR 7.1(d)(2) CONTROLLING/MOST APPROPRIATE
AUTHORITIES ......................................................................................... v

I. INTRODUCTION ............................................................................ 1

II. STATEMENT OF FACTS ................................................................ 3

III. LEGAL STANDARD ...................................................................... 9

IV. ARGUMENT .................................................................................. 10

I. PLAINTIFFS' COMPLAINT DOES NOT ALLEGE SUFFICIENT FACTS TO PLAUSIBLY SUGGEST GROUNDS FOR AN ENTITLEMENT TO RELIEF AGAINST WRIGHT. ................................. 10

    A. Plaintiffs Fail To State An Equal Protection Claim Against Wright. .12

    B. The FAC Does Not Show That Wright Violated 42 U.S.C. 1985(3). ............................................................................... 17

    C. Plaintiffs' FAC Asserts No Facts Supporting the Legal Conclusion That Wright Violated the Public Service Provision of the ELCRA. ..18

    D. Plaintiffs' FAC Fails to Allege Facts That Wright Violated Plaintiffs' Substantive Due Process Rights. ....................... 20

V. CONCLUSION .............................................................................. 25

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................ 2, 9, 10, 12, 15, 19, 20, 22, 23, 24

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................... 2, 9, 10, 12, 15

*Brintley v. St. Mary Mercy Hosp.*, 904 F. Supp. 2d 699, 726 (E.D. Mich. 2012) ...19

*Bukowski v. Akron*, 326 F.3d 702 (6th Cir. 2003) ........................................... 20, 24

*Cartwright v. Marine City*, 336 F.3d 487 (6th Cir. 2003) ............................... 20, 23

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).....................14

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365,
   379 (6th Cir. 2011) ............................................................................................13

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002) ..................................21

*Fares Pawn, LLC v. Indiana Dep't of Fin. Insts.*, 755 F.3d 839,
   (7th Cir. 2014) ...................................................................................................14

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ...........................................................17

*Harris v. Akron*, 20 F.3d 1396 (6th Cir.1994) ........................................................22

*Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) ................................................13

*K.S. v. Detroit Pub. Schs*, 2015 U.S. Dist. LEXIS 94312, *23-25,
   (E.D. Mich. July 21, 2015) ............................................................................ 21, 22

*Kallstrom v. Columbus*, 136 F.3d 1055 (6th Cir. 1998) .........................................21

*LULAC v. Bredesen*, 500 F.3d 523 (6th Cir. 2007) .................................................10

*Maher v. Roe*, 432 U.S. 464 (1977) ........................................................................14

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992).........................................19

*Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000).....................................................14

*Schroder v. Fort Thomas*, 412 F.3d 724 (6th Cir. 2005).........................................21

*Shehee v. Luttrell,*199 F.3d 295 (6th Cir.1999) ......................................................22

*Vakilian v. Shaw*, 335 F.3d 509 (6th Cir. 2001) .....................................................17

*Wright v. Murray Guard, Inc.*, 455 F.3d 702 (6th Cir. 2006) .................................19

**Statutes**

42 USC § 1985(3) ...............................................................................................1, 17

MCL 37.2302 ................................................................................ 18, 19

MCL 37.2302(a).................................................................................18

U.S. Const. amend. XIV, §1 ..............................................................13

**Rules**

E.D. MICH. LR 7.1(d)(2) ...............................................................iii, iv

Fed. R. Civ. P. 12 (b)(6)................................................................ 1, 3, 9

Fed. R. Civ. P. 8(a)(2) ................................................................ 1, 3, 10

## E.D. MICH. LR 7.1(d)(2)
## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

I.   DOES PLAINTIFFS' FIRST AMENDED COMPLAINT, AS TO DEFENDANT WRIGHT, CONTAIN SUFFICIENT FACUTAL MATERIAL, TAKEN AS TRUE, TO PLAUSIBLY SUGGEST THAT GROUNDS EXIST FOR PLAINTIFFS' ENTITLEMENT TO RELIEF AGAINST DEFENDANT WRIGHT?

Defendant Wright answers "No".

Plaintiffs answer "Yes".

## E.D. MICH. LR 7.1(d)(2)
## <u>CONTROLLING/MOST APPROPRIATE AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)


**Statutes**

Fed. R. Civ. P. 12 (b)(6)

Fed. R. Civ. P. 8(a)(2)

# I.   <u>INTRODUCTION</u>

The City of Flint ("Flint" or "City") is located in Genesee County ("County"), and owns and operates a water system providing water to City residents. (First Amended Complaint "FAC" ¶45).  Jeff Wright ("Wright") is the County Drain Commissioner (FAC ¶37), and County Agent under 1939 PA 342. Wright operates the County's water system, which is independent and separate from the City's water system.  The County system provides water to a number of Genesee County municipalities, but not the City.  Wright has no jurisdiction over the Flint's water system or Flint's water treatment plant ("WTP").

Plaintiffs initial Complaint did not name Wright as a defendant.  The Complaint alleged two substantive due process violations – state created danger and bodily integrity.  On May 25, 2016, Plaintiffs filed their FAC, which added Wright as a defendant and added four new counts, including, claimed race based denial of equal protection, wealth based denial of equal protection, invidious racial animus violating 42 USC § 1985(3), and race based violation of the Elliot Larsen Civil Rights Act ("ELCRA").

Wright moves to dismiss all of Plaintiffs' claims against him based on Fed. R. Civ. P. 12 (b)(6) applying Fed. R. Civ. P. 8(a)(2).  Plaintiffs' FAC fails to state a claim against Wright upon which relief can be granted because the Plaintiffs failed to provide this Court with a short and plain statement of the claims or sufficient

facts showing that Plaintiffs are entitled to relief against Wright.

Pursuant to *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Complaint must allege sufficient facts, accepted as true, to state a claim for relief which is plausible on its face. *Twombly*, *supra* at 570. A claim has facial plausibility when it pleads a factual context that allows the court to draw the reasonable inference that the defendant is liable for the misconduct claimed. *Id.* The factual allegations must create more than a possibility that the defendant is liable to Plaintiffs but less than a probability. The applicable standard is plausibility that the defendant is liable.

The FAC as to Wright does not state facts which suggest that Plaintiffs are plausibly entitled to relief against him. Instead, as to Wright, the FAC deals principally in conclusory allegations which do not ever cross the possibility threshold. Some FAC allegations are facts unrelated to any pleaded claim (e.g. FAC ¶49) Wright used political pressure to urge communities to form the Karegnondi Water Authority ("KWA"); some are conclusory statements without any contextual support (e.g. FAC ¶61) in June 2013, Wright, together with Dillon, Kurtz, and Walling, developed an interim plan ("Interim Plan") to use the Flint River ("River") for water before the KWA became operational; and some are bare legal conclusions (e.g. FAC ¶15) Wright, together with Snyder, Dillon, Kurtz, Walling, and others, violated Plaintiffs' Constitutional Rights (inferentially

2

through intentional racial and economic animus).

Further, the FAC does not adequately discuss the Detroit Water and Sewerage Department's ("DWSD") role in causing Plaintiffs' alleged injuries.  On April 17, 2013, DWSD, which was supplying water to Flint on a year-to-year basis, sent a notice of contract termination effective one year later (Ex. B at 4 – April 17, 2013).[1] The notice was sent in response to the Flint City Council on April 16, 2013, voting 7-1 to purchase raw water from KWA (Ex. B – April 16, 2013). DWSD's notice, forced Flint to decide whether to remain with DWSD, if it could, or use its WTP to treat River water until the KWA pipeline was completed.

Plaintiffs' Complaint against Wright should be dismissed under Fed. R. Civ. P. 12 (b)(6) applying Fed. R. Civ. P. 8(a)(2), because Plaintiffs have not pleaded facts, which if true, plausibly suggest they are entitled to relief against him.

## II.   STATEMENT OF FACTS

Flint owns and operates a water distribution system to provide water service to its residents. (Ex. A at 15).  Until 1967, Flint treated River water at its WTP. Flint then contracted with DWSD to buy treated water from DWSD.  Flint continued to operate the WTP as its emergency backup supply.  *Id*.  Even after Flint's contract with DWSD expired, Flint continued to purchase treated water

---

[1] Exhibits A and B, referenced herein, are those exhibits referenced and relied upon in Plaintiffs' First Amended Complaint, and are located at Doc #111, Pg ID 1704 (Ex. A) and 1787 (Ex. B).

from DWSD on a year-to-year basis. (Ex. A at 16).

DWSD began to significantly increase its price for water to Flint beginning in 2000. (Ex. A at 16). During this time, the MDEQ was insisting that someone build a second pipeline to Flint to provide a redundant supply. *Id;* FAC ¶49, as the power outage of 2004 showed was necessary. In response to DWSD's price increases and the MDEQ's redundancy demands, Flint and the County began to explore the cost to build a pipeline from Lake Huron to Flint. Wright lead the effort to build the new pipeline. (FAC ¶49). In 2010, the KWA was formed by the counties of Genesee, Lapeer, Sanilac and the cities of Flint and Lapeer.

In 2011, Flint studied the potential for using River water treated at the City's WTP as its primary water source (FAC ¶50) as an alternative to purchasing water from either DWSD or KWA. On July 1, 2011, the study was published (Ex. B at 2 – July 1, 2011) and stated:

> Report is completed for City of Flint on feasibility of using Flint WTP and Flint River as primary water supply. Notes Flint River water will require more treatment than Lake Huron water; recommends capital improvements and projects capital and operating costs (including phosphate addition).

(Ex. B at 2 – July 1, 2011). The report determined that River water could be adequately treated, but it would be expensive.

During 2012, Flint continued to study its three options for selecting its primary water source. (See Ex B at 2-3, entries for 2011-2012). On September 20,

4

2012, EM Kurtz asked DWSD for written permission to blend treated River water with DWSD water.   Kurtz believed blending would save Flint $2 million to $3 million annually (Ex B at 3 – June 26, 2012 and September 20, 2012).   While blending was discussed for some time, it was never done.   In the meanwhile, DWSD tried to persuade Flint to remain as its customer (FAC ¶53), and Wright tried to persuade Flint to buy water from KWA (FAC ¶54).

On March 25, 2013, Flint City Council approved a resolution to buy water from KWA by a 7 to 1 vote. (Ex. B at 4 – March 25, 2013).  Since Flint was then under the jurisdiction of an EM, the Council vote was not final.  *Id*.  On March 29, 2013, Kurtz, on Flint's behalf, approved a resolution to purchase water from KWA and asked the Dillon to approve that purchase (Ex. B at 4 – March 29, 2013).

On April 11, 2013, Dillon authorized Kurtz to enter into a contract with KWA for Flint's permanent water supply, but only after considering a final offer from DWSD. (Ex. B at 4 – April 11, 2013).  On April 15, 2013, DWSD made that offer, but, after independently analyzing the DWSD and KWA offers, Kurtz, the Michigan Department of Environmental Quality ("MDEQ"), and Dillon's office each concluded KWA's offer was a better value for Flint. (Ex. B at 4 – April 15, 2013).  On April 16, 2013, Kurtz, on behalf of Flint, signed a contract with KWA to purchase Lake Huron water to be treated at Flint's WTP.  (Ex. B at 4 – 4/16/16).

Immediately thereafter, on April 17, 2013, DWSD sent a notice to Flint terminating their water supply contract effective one year later. (Ex. A at 16). Flint was uncertain whether DWSD would physically stop delivering water and, therefore, turned to water from the River treated at its WTP until KWA came on line. This was not an option for the County. The County had no water treatment plant nor did it have permits to take water from the River. The County was compelled to continue purchasing water from DWSD, its only available source.

Plaintiffs choose to ignore these physical facts and claim, without factual support, that in June 2013, Snyder, Dillon, Wright, Mayor Walling, and EM Kurtz and EM Early developed an Interim Plan to use the River water for Flint and DWSD water for the County before KWA became operational. (FAC ¶¶ 61, 151). According to Plaintiffs, the Interim Plan was based on intentional racial animus and wealth discrimination to cause rich white residents of the County to receive safe superior DWSD water while the poor African American residents of Flint received grossly inferior River water. (FAC ¶¶60, 151, 155, 159).

Plaintiffs never explain why an Interim Plan was needed since the County residents and Flint residents are served by two separate independent water systems. They also ignore that the County could not take water from the River, and even if it obtained permits, had nowhere to treat the water. The pleaded Interim Plan makes

no physical sense; makes no economic sense; and, defies common sense.  It is not plausible.

The FAC itself shows Flint unilaterally decided to treat River water at the WTP.  On June 26, 2013, Kurtz signed a resolution to hire LAN to prepare the WTP for full-time operation using the River as its primary drinking water source. (Ex B at 5 – June 26, 2013).  In June 2013, Flint notified the MDEQ it intended to operate the WTP full-time using the River to provide drinking water. (Ex. B at 5 – June 2013).

There is no indication that Wright had any influence over the decision and had no decision making authority over Flint or the MDEQ.  During 2014, Flint and the City of Detroit, both under EMs and controlled by the State, tried unsuccessfully to negotiate terms to allow Flint to buy DWSD water (Ex. A at 16). Yet, they could not reach an agreement. *Id*.  On April 25, 2014, Flint officially switched its water source to the River and began using the WTP to treat it (Ex. B at 6 – April 25, 2014).  The County thereafter continued to buy water from DWSD at a grossly inflated price.

Shortly after switching to the River, the City began to experience problems due to bacterial formation (Ex. B at 7 – August 15, 2014 and September 5, 2014). Then the water showed elevated levels of total trihalomethane, a disinfection byproduct (Ex B at 7 – September 10, 2014).  Then, on January 9, 2015, U of M-

7

Flint notified City officials it found elevated levels of lead at school water fountains (Ex. B at 7 – January 9, 2015).  Complaints about the color, odor, and taste of the water were numerous.  Testing at some homes in the City showed extremely high levels of lead – e.g. Walters' home showed 397 ppb well above the 15 ppb limitation. (Ex. B at 11 – March 17, 2015).

On October 1, 2015, the County Board of Commissioners and the County Health Department issued a "Do Not Drink" advisory for Flint residents using River water (Ex. B at 20 – October 1, 2015).  The Health Department also declared a Public Health Emergency.  *Id.*  On October 16, 2015, Flint reconnected to DWSD as its source of drinking water.  (Ex. B at 20 – October 16, 2015).

Plaintiffs sued on November 13, 2015.  As to Flint's decision to use and treat River water at the WTP, the original complaint alleges only that

> In April 2014, although safe water from Detroit remained available on a temporary basis until the KWA became operational two years later, Flint Emergency Manager at the time Defendant Early ordered Flint to draw water from the Flint River even though he knew the water was highly corrosive and dangerous to people and property when distributed without proper anti-corrosive treatment.

There is no reference to Wright or to the Interim Plan or to intentionally depriving Flint residents of healthy water because they are poor or black.

Plaintiffs' FAC, in its Exhibits A and B, shows on its face that Wright had nothing to do with Flint's decision to utilize the River.  Plaintiffs' FAC does not plead sufficient plausible facts to allow this Court to draw a reasonable inference

8

that Wright is liable to them.  For this reason, Fed. R. Civ. P. 12(b)(6) entitles Wright to dismissal of Plaintiffs' Complaint against him; it fails to state claim upon which relief can be granted.

### III.   <u>LEGAL STANDARD</u>

In deciding a motion under Rule 12(b)(6), the Court must accept well-pleaded allegations of fact, but only well pleaded allegations of fact, as true. *Twombly*, 550 U.S. at 555.  *Twombly* held that a motion to dismiss will be denied where the "[f]actual allegations [are not] enough to raise a right for relief above the speculative level … on the assumption that all of the complaint's allegations are true...." *Iqbal*, 556 U.S. 697 (quoting *Twombly*, 550 U.S. at 570). Facial plausibility does not require that the claim be probable, but does require more than a sheer possibility that a defendant has acted unlawfully.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility....'" *Id*. at 1949 (quoting *Twombly*).

Making a determination of plausibility is a context-specific task that requires the court to draw on its judicial experience and common sense.  *Id*. at 1950.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 1949.

A plaintiff's factual allegations, while "assumed to be true, must do more

than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (quoting *Twombly, supra*). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Id*. at 527.

## IV.   ARGUMENT

### I.   PLAINTIFFS' COMPLAINT DOES NOT ALLEGE SUFFICIENT FACTS TO PLAUSIBLY SUGGEST GROUNDS FOR AN ENTITLEMENT TO RELIEF AGAINST WRIGHT.

In direct contravention of Fed. R. Civ. P. 8(a)(2), Plaintiffs' Complaint contains mere conclusory allegations regarding Wright's role in Flint's decision to utilize the River, while concluding that he intentionally caused the harm that allegedly ensued.  Plaintiffs' claims against Wright assert conclusory allegations that Wright participated in an Interim Plan to utilize the River as Flint's water source with various other Defendants.  Plaintiffs do not present sufficient facts to provide the Court a basis to draw the reasonable inference that Wright participated in that decision or is liable for the harm alleged.  *Iqbal*, 556 U.S. at 678. Each of the claims against Wright will be examined below under *Iqbal's* plausibility standard, but a brief summary of *Iqbal's* holding helps to frame the legal argument.

In *Iqbal*, a detainee taken into custody following September 11, 2001 asserted that Attorney General Ashcroft and FBI Director Mueller adopted an

unconstitutional policy that subjected him to harsh conditions of confinement because of his race, religion or national origin.  *Id*. at 666.  The Court held that Iqbal's pleadings did not state sufficient factual material, taken as true, to plausibly suggest grounds existed to entitle him to relief against Ashcroft and Mueller.

Iqbal asserted that he was designated a person of high interest because of his race, religion or national origin in violation of the First and Fifth Amendments.  *Id*. at 668-669.  The Court stated that the plaintiff's claim must contain factual allegations that a decision maker undertook a course of action <u>because</u> of the action's adverse effect on an identifiable group. *Id*. at 676. Accordingly, the plaintiff must "plead sufficient factual matter to show that [defendants] adopted and implemented the … policies at issue not for a neutral, investigative reason but for the purpose of discriminat[ion]."  *Id*. at 677.

Iqbal's Complaint alleged that Ashcroft was the principal architect of the "invidious" policy and that Mueller was instrumental in executing it.  *Id*. at 680-681.  Such "bare assertions" were nothing more than a formulaic recitation of the elements of a discrimination claim.  As such, the allegations were conclusory and not entitled to be assumed true and the Court determined that as to the "invidious discrimination" Iqbal wanted the Court to infer, "discrimination is not a plausible conclusion."  *Id*. at 682. In order for Iqbal's allegations to state a claim for invidious discrimination, he would have had to allege "more by way of factual

content to 'nudge' his claim of purposeful discrimination 'across the line from conceivable to plausible.'" *Id*. at 683 (quoting *Twombly*, *supra* at 570). Based on these legal principles, it is evident that Plaintiffs' claims should be dismissed.

### A. Plaintiffs Fail To State An Equal Protection Claim Against Wright.[2]

Like the allegations in *Iqbal*, Plaintiffs' FAC contains mere legal conclusions asserting that Wright and others deliberately exposed Plaintiffs to dangerous water from the Flint River because of their race and income level. These bare assertions are a mere "formulaic recitation of the elements" of this claim. The allegations are conclusory and not entitled to be assumed as true. *Iqbal*, *supra* at 681. Accordingly, Plaintiffs' equal protection claims against Wright should be dismissed. The only allegations in the FAC which even arguably relate to Wright and the equal protection claims are:

1. Defendants' conduct deliberately exposed Plaintiffs to contaminated River water, knowing that it could and would result in widespread serious damage; (FAC at ¶154)

2. In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA pipeline was being constructed; (FAC at ¶155)

3. These Defendants knew that water from the River was "grossly inferior" to the Lake Huron water Flint and the County residents were

---

[2] Wright was added as a Defendant at the same time the equal protection claim was added. The claims against Wright are addressed out of order in this brief because the equal protection allegations most closely mirror the legal principles set forth in *Iqbal*. The equal protection claims are Counts III and IV in Plaintiffs' Complaint. Regardless of the order, all claims will be addressed herein.

receiving from DWSD, the River water would have to be processed at the Flint WTP, which required millions of dollars in upgrades and that using River water was rejected in 2011; (FAC at ¶¶156 – 158); and

4.    The Defendants devised the "Interim Plan" that caused the predominantly white and wealthy County residents to continue to receive "safe and superior" water through DWSD and predominantly poor and African-American Flint residents would receive River water that was "known to be grossly inferior and unsafe." (FAC at ¶159).

These conclusory allegations do not state sufficient factual material, taken as true, to plausibly suggest that Plaintiffs are entitled to relief against Wright and Plaintiffs' equal protection claims against Wright should be dismissed.

### 1.    <u>Relevant Case Law</u>.

The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws" and prevents states from making distinctions that, among other things, <u>intentionally treat one individual differently from others similarly situated without any rational basis</u>. *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010); U.S. Const. amend. XIV, §1.  To state an equal protection claim, a plaintiff must "adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'"  *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).

The Supreme Court has made it clear that the Equal Protection Clause is "a

direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A plaintiff bears the burden of demonstrating that a defendant intentionally treated someone differently than similarly situated individuals. *Id.* Courts do not require "exact correlation" when evaluating whether parties are similarly situated and demand only "relevant similarity." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). Where it is clear that no reasonable jury could find that the similarly situated requirement has been met, the court may dismiss a plaintiff's equal protection claim. *Fares Pawn, LLC v. Indiana Dep't of Fin. Insts.*, 755 F.3d 839, 846 (7th Cir. 2014).

## 2. Analysis Demonstrating That Plaintiffs' Complaint Fails To Assert A Plausible Equal Protection Claim.

Plaintiffs assert that because Wright and other Defendants allegedly knew that the River was "inferior" to the cleaner water provided by DWSD, they intentionally devised a plan to deliver River water to low income African-American Flint residents, and deliver clean Lake Huron water to the wealthy, white County residents to discriminate against Flint residents based on their race and their wealth. Plaintiffs' claims fail for multiple independent reasons.

a. Wealth Is Not A Class Protected. As to the claim that Wright engaged in intentional discrimination based on wealth, income or wealth is not a recognized protected class subject to equal protection. *Maher v. Roe*, 432 U.S. 464, 470-71 (1977) (wealth-based classifications do not violate equal

14

protection).  Therefore, wealth cannot form the basis of an equal protection claim.

          b.    <u>The FAC Does Not State A Claim Based on Race</u>.

Plaintiffs' allegations that Flint residents were treated differently based on race is parallel to the conclusory allegations in *Iqbal*.  As in *Iqbal*, Plaintiffs' legal conclusions do not provide adequate factual material to plausibly suggest Plaintiffs are entitled to relief against Wright.  Under *Iqbal*, a plaintiff must plead sufficient factual content to allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Iqbal*, 556 U.S. at 678 (citing *Twombley, supra* at 556).  These Plaintiffs have alleged no factual support for their legal conclusions.  Further, the Court is not required to accept as true a legal conclusion couched as a factual allegation.  *Id*. at 679.  Because Plaintiffs have not asserted sufficient factual support for their legal conclusions, this Court should not accept those conclusions as true.  Plaintiffs have not provided a factual context to justify the conclusions.  Thus, as in *Iqbal*, the Court should draw the inference that Wright is not liable to Plaintiffs.

Plaintiffs' conclusory allegation in ¶61 of the FAC that Wright, together with others, developed an Interim Plan to use the River before KWA became operational is the closest they come to a factual allegation about Wright, but even it is conclusory.  And if true, it contains no facts which support Plaintiffs' legal conclusions regarding race discrimination.  Similarly, Plaintiffs' allegation that

Wright knew that the River was evaluated in 2011 and rejected as a water source does not support an inference that Wright developed a plan to use the River based on race discrimination. Moreover, various factors contradict the notion that an Interim Plan was ever necessary for the April 2014-2016 period.  Plaintiffs' FAC recognizes that Flint operated its own water system and WTP in June 2013 and thereafter. (Ex. A at ¶¶15-16). Flint negotiated with DWSD to supply water to Flint on a long term basis but their negotiations failed.  (Ex. A at ¶16).  On June 26, 2013, Flint's EM unilaterally entered into a contract with LAN to place Flint's WTP into service to treat River water. Flint could have asked to receive DWSD water during that time period but simply chose not to do so. (Ex. A at ¶17). Accordingly, based on Exhibits A and B, it is not plausible to infer that Wright influenced Flint to use the River based on racial animus.

          c.     <u>The FAC Does Not Allege That Flint and County Residents Are Similarly Situated</u>.  In order to plead a plausible claim for relief, Plaintiffs must assert facts showing that Wright treated similarly situated groups differently on the basis of race.  The FAC does not even assert the conclusion that the residents of Flint and the County are similarly situated and, indeed, demonstrates that they are not. Flint is uniquely positioned to utilize the River because it has a WTP, has permits to take water from the River, and operates a separate water system.  The County has no WTP and no permits to remove River

16

water.  Therefore, based on Plaintiffs' allegations, residents of Flint and the County are not similarly situated.

**B.**     **The FAC Does Not Show That Wright Violated 42 U.S.C. 1985(3).**

To prevail on this claim, a plaintiff must prove (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen.  *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2001); 42 U.S.C. ¶1985(3).  The Supreme Court has stated that the language requiring intent to deprive of equal protection means there must be some racial or other class-based, invidiously discriminatory animus behind the conspirators' actions. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

As with Plaintiffs' equal protection claims, this claim merely mirrors the statutory language and consists of legal conclusions with no factual support. Plaintiffs assert that Wright participated in forming an alleged Interim Plan for Flint to utilize the River. His participation in the plan allegedly demonstrated invidious race discrimination because it resulted in the African-American Flint residents having inferior River water while the white County residents continued receiving superior DWSD water. As with the equal protection claim, Plaintiffs assert only that because the plan led to an unexplained difference in water supply,

it was a conspiracy to further race discrimination.

This legal conclusion is not supported by any facts. As discussed, Flint and County residents are served by two physically, financially, and legally distinct water systems. Neither had anything to do with the other's system. The County could not take River water and did not operate a WTP next to it as Flint did. Therefore, the residents of Flint and the County are not similarly situated based on numerous factors other than race. Plaintiffs have provided no facts indicating Wright harbors any racial animus. Regardless, the complete failure of Plaintiffs to provide factual support for their legal conclusions is evident. For that reason, this Court is not bound to accept the conclusions as true for purposes of this motion. As in *Iqbal*, mere "naked assertions devoid of further factual support" do not state a plausible claim for relief. Therefore, this claim should be dismissed.

### C.  Plaintiffs' FAC Asserts No Facts Supporting the Legal Conclusion That Wright Violated the Public Service Provision of the ELCRA.

1.  **Relevant Law.** MCL 37.2302 provides: "Except where permitted by law, a person shall not:

> (a)   Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."

To prove a claim under MCL 37.2302(a), a plaintiff must establish: (1) discrimination based on a protected characteristic; (2) by a person; (3) resulting in

the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations; (4) of a place of public service. *Brintley v. St. Mary Mercy Hosp.*, 904 F. Supp. 2d 699, 726 (E.D. Mich. 2012).

To compare the treatment of a protected class plaintiff to that of a non-protected person, the plaintiff must show that the "comparables" are similarly-situated in all relevant respects. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). To be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the defendant's treatment of them for it. *Mitchell, supra* (citations omitted); *Wright v. Murray Guard, Inc*., 455 F.3d 702, 710 (6th Cir. 2006).

 2. **Analysis.** Plaintiffs have failed to state a plausible claim for relief under MCL 37.2302. As with Plaintiffs' other claims, Plaintiffs assert that the alleged "Interim Plan" to provide water to Flint residents from the River shows invidious race discrimination due to the unexplained different treatment of Flint and County residents. Plaintiffs have pled no facts demonstrating that Flint and County residents were similarly situated in all material respects. As Flint and County residents receive water service from two independent water systems, this is next to impossible to do. Under *Iqbal*, where the plaintiffs' facts do not permit the

19

Court to infer more than the mere possibility of misconduct, the pleader is not entitled to maintain the lawsuit. *Iqbal*, *supra* at 679.

### D. Plaintiffs' FAC Fails to Allege Facts That Wright Violated Plaintiffs' Substantive Due Process Rights.

The FAC contains no facts alleging that Wright violated Plaintiffs' substantive due process rights through a state created danger or a violation of Plaintiffs' bodily integrity. Indeed, the only reference to Wright in this regard is Plaintiffs' blanket reference to "all defendants" in these claims. The FAC fails to assert any factual matter to state a plausible claim for relief as to Wright. *Iqbal, supra*.

### 1. Relevant Case Law – State Created Danger. To establish a

state created danger substantive due process claim, a plaintiff must demonstrate:

1. An affirmative act by the state creating or increasing the risk that plaintiff would be exposed to an act of violence by a third party;

2. A special danger to plaintiff where the state's actions placed plaintiff at risk, as distinguished from a risk that affects the public; and

3. The state knew or should have known that its actions specifically endangered plaintiff.

*Cartwright v. Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). Under this standard, the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference. *Bukowski v. Akron*, 326 F.3d 702, 710 (6th Cir. 2003). A deliberate-indifference standard is

appropriate in settings that provide the opportunity for reflection and unhurried judgments. *Ewolski v. City of Brunswick*, 287 F.3d 492, 500 (6th Cir. 2002).

Courts recognize that deliberative bodies choose between competing policy options, but a substantive due process violation does not arise whenever the government's choice "prompts a known risk to come to pass," as most governmental policy choices come with risks attached and it is not unlawful for an official to pick one option over another. *Schroder v. Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005). Even if a state actor is aware of a substantial risk of harm when it takes action, the Sixth Circuit is "unlikely to find deliberate indifference if action was motivated by a countervailing, legitimate governmental purpose." *Id*.

2. **Relevant Case Law – Bodily Integrity**.  Individuals have "a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity," and this right is fundamental where "the magnitude of the liberty deprivation that [the] abuse inflicts upon the victim . . . strips the very essence of personhood." *K.S. v. Detroit Pub. Schs*, 2015 U.S. Dist. LEXIS 94312, *23-25, (E.D. Mich. July 21, 2015) (Ex. 1); *Kallstrom v. Columbus*, 136 F.3d 1055, 1062-1063 (6th Cir. 1998).   The Sixth Circuit recognizes two types of violations:  "(1) official acts that are unreasonable and arbitrary and may not take place no matter what procedural protections accompany them, and (2) official conduct that shocks the conscience." *Harris v. Akron*, 20

F.3d 1396, 1405 (6th Cir.1994). Actions meet this high standard if they are an egregious abuse of governmental power. *Shehee v. Luttrell,* 199 F.3d 295, 301 (6th Cir.1999). Recently, in *Detroit Pub. Schs*, *supra*, the court held that a single allegation was insufficient to demonstrate a plausible claim. The court determined that the plaintiff did not plead facts sufficient to allege a violation of his substantive due process right to bodily integrity when he claimed only that a government official sexually abused him by placing a hand on his thigh and adjusting his clothes.

      **3.**     <u>**Analysis.**</u> Plaintiffs' substantive due process claims appear to rest on the allegation that Wright knew that a study conducted in 2011 recommended against using the River as a water source and that upgrades to Flint's WTP could cost millions. (FAC at ¶62). Under *Iqbal*, a plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for alleged misconduct. Plaintiffs have alleged no factual support except awareness of the study for their legal conclusions. This single factual allegation is insufficient to support Plaintiffs' legal conclusion that Wright is liable for creating a danger to Plaintiffs or otherwise attacking their bodily integrity.

a. <u>Plaintiffs Have Not Alleged An Affirmative Act by Wright</u>. Plaintiffs seem to assert that Wright's participation in the alleged Interim Plan to use the River as Flint's primary water source is his affirmative act leading to liability. This conclusory allegation does not support Plaintiffs' claim that he created or exposed Plaintiffs to an increased risk of harm. Where a plaintiff's facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown that the pleader is entitled to relief. *Iqbal*, *supra* at 679. Plaintiffs' single conclusory allegation regarding Wright's alleged knowledge of a recommendation against using the River as a water source for Flint shows nothing more than the "mere possibility" of misconduct, which is insufficient to demonstrate a plaintiff's entitlement to relief.

Further, this allegation fails to assert that Wright's conduct exposed Plaintiffs to an act of violence by a third party, which is a required element of this claim. *Cartwright, supra*. Plaintiffs assert only that a series of additional factors and actions by other defendants did that. These allegations do not provide sufficient factual support for the legal conclusion that Wright's conduct created or exposed them to harm, which is required for a plausible claim.

b. <u>Wright Had No Knowledge of Harm</u>. Plaintiff is required to assert that "the official must 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must

also draw the inference.'" *Bukowski, supra* at 710. Plaintiffs have not asserted that Wright was aware of facts from which he could infer that a substantial risk of serious harm would befall Plaintiffs or that he actually made this connection. The harm Plaintiffs allege arose from Flint utilizing "highly corrosive and toxic" water, the presence of Legionella bacteria, corrosion of the entire infrastructure of Flint's water system and lead poisoning. (FAC at ¶69, 79, 83, 93). The FAC provides no factual support for the legal conclusion that Wright had knowledge of these harms and took affirmative action to cause them.

    c. <u>Wright Had No Impact on Plaintiffs' Bodily Integrity</u>. As with Plaintiffs' legal conclusions assuming a state created danger, Plaintiffs' FAC contains no factual allegations supporting the legal conclusion that Wright engaged in conduct which injured their bodily integrity. Plaintiffs' claim against Wright mirrors *Iqbal's* pleading deficiencies. Plaintiffs assert that Wright engaged in conduct that was so egregious that it "shocks the conscious" with respect to Plaintiffs' bodily integrity. (FAC at ¶136). Yet, like *Iqbal*, Plaintiffs have only asserted this legal conclusion with no factual support. Plaintiffs' claim that Wright participated in an "Interim Plan" for Flint to utilize the River while knowing that a report recommended against using the River has no factual support. Based on *Iqbal*, the Court is not bound to accept this conclusion as true and without the requisite support, Plaintiffs' claim should be dismissed. *Iqbal, supra* at 679.

## V.    <u>CONCLUSION</u>

Therefore, for the reasons stated above Defendant Wright requests that this Honorable Court grant his Motion, dismissing all claims against him in Plaintiffs' First Amended Complaint, in their entirety with prejudice.

Respectfully submitted,

GENESEE COUNTY DRAIN COMMISSIONER'S OFFICE

s/Joseph F. Galvin
JOSEPH F. GALVIN (P13821)
Attorney for Defendant Jeff Wright
4610 Beecher Road
Flint, MI  48532
(810) 732-7870
jgalvin@gcdcwws.com

McGRAW MORRIS P.C.

s/Thomas J. McGraw
THOMAS J. MCGRAW (P48817)
KEVIN K. KILBY (P68599)
STACY J. BELISLE (P59246)
2075 W. Big Beaver Road, Ste. 750
Troy, MI  48084
Dated:  August 1, 2016          248-502-4000

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA MAYS, *et al.*,

              Plaintiffs,

Case No.: 5:15-cv-14002-JCO-MKM

Honorable:  John Corbett O'Meara
Magistrate Judge:  Mona K. Majzoub

vs.

JEFF WRIGHT, in his official and
individual capacity, *et al.*,

              Defendants.

---

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2016, I electronically filed DEFENDANT

JEFF WRIGHT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. PRO.

12(b)(6), BRIEF IN SUPPORT and CERTIFICATE OF SERVICE with the Clerk

of the Court using the ECF system which will send notification of such filing to all

counsel of record and I hereby certify that there are no non-ECF participants.

McGRAW MORRIS P.C.

s/Thomas J. McGraw
THOMAS J. MCGRAW (P48817)
KEVIN K. KILBY (P68599)
STACY J. BELISLE (P59246)
2075 W. Big Beaver Road, Ste. 750
Troy, MI  48084
248-502-4000

Dated:  August 1, 2016

# EXHIBIT 1

## *K.S. v. Detroit Pub. Schs*

United States District Court for the Eastern District of Michigan, Southern Division

July 21, 2015, Decided; July 21, 2015, Filed

Case Number 14-12214

**Reporter**
2015 U.S. Dist. LEXIS 94312; 2015 WL 4459340

K.S., Plaintiff, v. DETROIT PUBLIC SCHOOLS, CHARLES PUGH, ROY ROBERTS, ROBERT BOBB, BERRY GREER, and MONIQUE MCMURTRY, Defendants.

**Subsequent History:** Objection overruled by *K.S. v. Detroit Pub. Schs, 2015 U.S. Dist. LEXIS 95093 ( E.D. Mich., July 22, 2015)*
Summary judgment granted, in part, summary judgment denied, in part by, Dismissed by, in part, Summary judgment denied by *K.S. v. Detroit Pub. Schs, 2015 U.S. Dist. LEXIS 123378 ( E.D. Mich., Sept. 16, 2015)*
Motion granted by, in part, Motion denied by, in part, Motion denied by, in part, Without prejudice, Motion denied by, in part, As moot *K.S. v. Detroit Pub. Sch., 2015 U.S. Dist. LEXIS 145644 ( E.D. Mich., Oct. 23, 2015)*
Motion granted by, in part, Motion denied by, in part, Motion denied by, As moot *K.S. v. Lawson, 2015 U.S. Dist. LEXIS 148011 ( E.D. Mich., Nov. 2, 2015)*
Motion granted by, Judgment entered by *K.S. v. Detroit Pub. Schs, 2015 U.S. Dist. LEXIS 169961 ( E.D. Mich., Dec. 21, 2015)*

**Counsel:** [*1] For K.S., Plaintiff: Benjamin J. Wilensky, William R. Seikaly, Seikaly Stewart & Bennett, P.C., Farmington Hills, MI.

For Detroit Public Schools, Roy Roberts, Robert Bobb, Defendants: Rebecca Shaw Hicks, LEAD ATTORNEY, Phyllis L. Hurks-Hill, Detroit Public Schools, Detroit, MI; Theophilus E. Clemons, LEAD ATTORNEY, Detroit Public Schools District, Office of the General Counsel, Detroit, MI.

For Charles Pugh, Defendant: Marc A. Deldin, Deldin Law, PLLC, Mount Clemens, MI.

For Berry Greer, Monique McMurtry, Defendants: Phyllis L. Hurks-Hill, Rebecca Shaw Hicks, Detroit Public Schools, Detroit, MI; Theophilus E. Clemons, Detroit Public Schools District, Office of the General Counsel, Detroit, MI.

**Judges:** Honorable David M. Lawson, United States District Judge.

**Opinion by:** DAVID M. LAWSON

## Opinion

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO AMEND THE COMPLAINT AND GRANTING IN PART MOTION FOR JUDGMENT ON THE PLEADINGS**

The plaintiff filed a complaint containing disturbing allegations of sexual misconduct by a former Detroit City Council member in his role as a volunteer teacher at a Detroit public school. The plaintiff — who is identified only by his initials, although he is over eighteen years old — alleges that defendant [*2] Charles Pugh made sexual advances toward him when he was a student at the Frederick Douglass Academy, culminating in repeated solicitations for the plaintiff to record a video of himself masturbating, for which Pugh paid him money. The plaintiff filed a complaint alleging various federal and state law claims against Pugh, the Detroit Public Schools, and its administrators. The defendants other than Pugh filed a motion for judgment on the pleadings, to which the plaintiff's response included a motion for leave to file an amended complaint. The defendants responded to the motion to amend, arguing that the amendment would be futile for most of the same reasons stated in their motion for judgment on the pleadings. The Court heard oral argument on the motions on April 23, 2015. The Court believes that the most efficient approach is to permit the amendment, and assess the amended complaint in light of the Detroit Public Schools defendants' motion for judgment on the pleadings. Having done so, the Court finds that the amended complaint fails to state a claim for which relief can be granted against the Detroit Public Schools defendants under *42 U.S.C. § 1983*. However, the plaintiff has alleged proper claims [*3] under the Michigan Elliott-Larsen Civil Rights Act and Title IX of

the Education Amendments of 1972, 20 U.S.C. § 1681(a)(1). Therefore, the Court will grant in part and deny in part the motion for judgment on the pleadings.

I.

According to the amended complaint, plaintiff K.S. is a former student of the Frederick Douglass Academy for Young Men, an all-boys school for grades 6 through 12 operated by defendant Detroit Public Schools. Defendants Roy Roberts and Robert Bobb are former emergency managers of defendant DPS. Defendants Berry Greer and Monique McMurtry are, respectively, the principal and assistant principal at the Douglass Academy. Defendant Charles Pugh is the former president of the Detroit City Council, and the president of the "Charles Pugh Leadership Forum," which appears to have been Pugh's creation; it was a program of lectures and activities put on by Pugh for students at the Douglass Academy.

The nominal goal of the Charles Pugh Leadership Forum (CPLF) program was "to provide life and job skills for students in the program." All seniors at the Douglass Academy were required by the school to attend the forum in order to graduate. The plaintiff alleges that, through the program, "defendant Pugh was given unprecedented access and control over male students at [Douglass Academy], [*4] without any form of supervision, monitoring or control by DPS," and in particular he asserts that "no staff members at the [Academy] were present during CPLF sessions for the purpose of supervision, despite the fact that . . . those sessions were a required part of the [Academy] curriculum, and were held at the [Academy]."

The amended complaint states that sometime before the fall of 2012, members of the DPS Board of Education were aware of defendant Pugh's "tendencies towards pedophilia and sexual abuse and harassment of school-aged boys," and "had discussed the matter on several occasions." Although the pleading alleges that one or more of the DPS school board members "informed Defendants Bobb and Roberts regarding these tendencies, and urged that Pugh not be permitted to be present in DPS school buildings, [and] that DPS [should not] host the CPLF program," the plaintiff offers no facts stating who was informed, what was said, or what specific conduct by Pugh constituted the prior sexual abuse or harassment. Bobb and Roberts allegedly ignored the concerns expressed by members of the school board, and "did nothing further to prevent Pugh's and CPLF's presence and participation in [*5] activities at DPS schools." Instead, the plaintiff alleges

that defendant Bobb "overrode a school board decision of DPS prohibiting Pugh from establishing the CPLF at the [Douglass Academy]," and defendant Roberts "continued to enforce the decision put in place by defendant Bobb to allow the CPLF at the [Academy]." The plaintiff alleges that unspecified employees of defendant DPS "allowed defendant Pugh to place construction paper over the windows to the entry doors of the classroom in which the CPLF was held, allowing defendant Pugh to obscure events taking place within." He alleges that "no later than 2009 and continuing until 2011, defendant Greer was aware of the procedures regarding covering the classroom windows during the CPLF classroom sessions."

The plaintiff did not know Pugh and had never met him before the start of the Pugh Leadership Forum program, but he was aware that Pugh was president of the city council. The amended complaint does not identify when the plaintiff first attended the forum program and met Pugh, but it implies that the plaintiff's attendance started some time during the 2012-13 school year. Soon after the program began, the plaintiff noticed Pugh giving [*6] him "extra attention" and "'groom[ing] him' in preparation for making sexual advances." The plaintiff alleges that it was apparent to him that Pugh was interested in a sexual relationship with him, but he does not state when he came to that awareness. He does state that his classmates teased him about the attention Pugh lavished on him, however.

Although the plaintiff does not allege that success at school or in Pugh's class was influenced by his response to Pugh's attention, he states:

As part of the CPLF curriculum, Pugh urged plaintiff that it was crucial to work hard, and make money using whatever talents and means plaintiff had available to him, that were needed or desired by others, in order to transition into the adult world.

At a time beginning no later than May 2013, defendant Pugh, as part of the grooming process, and purportedly as part of the CPLF program, began assisting plaintiff with obtaining a job. Defendant Pugh, as part of the CPLF curriculum, told plaintiff that dress and appearance were crucial to succeed in a career, and specifically informed plaintiff that he would take him to purchase clothing for his "job interview[.]" Plaintiff indicated that he needed to get permission [*7] from his Mother. Plaintiff used defendant Pugh's cell phone to call his Mother, who specifically did not give him

permission to go with defendant Pugh.

Am. Compl.PP 26-29. Notwithstanding that the plaintiff's mother had not given him permission to go clothes shopping with Pugh, Pugh told the plaintiff to meet him outside the school building at 2:00 p.m. on an unspecified date "no later than May 2013." K.S. went outside at the appointed time, got into Pugh's car, and they rode together to the Men's Warehouse, K&G Men's Warehouse, and a Metro PCS store in Madison Heights.

During the shopping trip, Pugh learned that the plaintiff did not have a cell phone of his own, and that earlier text messages sent by Pugh to the plaintiff all had gone to the plaintiff's mother's cell phone. The complaint does not suggest the specific content of any of those earlier messages, but the plaintiff alleges that his mother believed that the messages had come from "a girl that had a crush on plaintiff." Pugh took the plaintiff to Metro PCS, bought a cell phone, and gave it to the plaintiff, "so that Pugh could have contact with plaintiff without interference from plaintiff's mother."

While Pugh and the plaintiff [*8] were shopping for clothes "each time plaintiff tried on a pair of pants, defendant Pugh doted on the plaintiff by tucking in his pants and adjusting the clothes in a manner that made plaintiff very uncomfortable." After they finished shopping for clothes, "defendant Pugh stopped at CVS to withdraw money from an ATM," and "[w]hen defendant Pugh returned to the vehicle, [he] handed plaintiff Forty ($40.00) Dollars and, while smiling, put his hand on plaintiff's upper thigh." The plaintiff "removed defendant Pugh's hand from his thigh, but defendant Pugh laughed while staring at plaintiff."

On the evening of the same day that Pugh took the plaintiff clothes shopping and bought him a cell phone, Pugh "began text messaging plaintiff on a regular basis, aggressively pursuing plaintiff for a sexual relationship, and offering him money and gifts in exchange for sex or videos of the plaintiff performing sexual acts." On May 31, 2013, Pugh began "promising [the plaintiff] gifts, such as video games and money for performing sexual acts." Pugh "made it clear to plaintiff that [Pugh's] career would be ruined if anyone found out about these bribes, [*9] and continuously told plaintiff to keep their conversations private." On June 1, 2013, the plaintiff told Pugh that he needed $160, and Pugh promised to pay him that amount for a video of the plaintiff masturbating. The plaintiff at first told Pugh that he did not feel comfortable making the video, but Pugh

persisted in urging the plaintiff to make the video, "preying upon plaintiff's emotions and twisting the lessons and curriculum taught to Plaintiff at the CPLF sessions Plaintiff was required [or] encouraged to attend at the [Douglass Academy]." On June 2, 2013, the plaintiff recorded on an iPod given to him by Pugh a video of himself masturbating, and then gave the iPod to Pugh in exchange for $160. On June 3, 2013, Pugh sent a text message to the plaintiff offering "to perform oral sex on the plaintiff in exchange for money." Apparently no further contact between Pugh and the plaintiff occurred.

The plaintiff alleges that as a result of Pugh's "harassment and abuse" he "feels [] extreme shame, embarrassment, and emotional distress[,] lost the ability to trust others, and lost the desire to continue his education." The plaintiff contends that as a result of the events, he "paid [*10] less attention during the 2012-2013 school year," and that he "had planned on attending college following his high school graduation, but because of Pugh's abuse and harassment, has been unable to do so."

Pugh concedes in other motion papers that he "is a gay man and paid money for a selfproduced video of Plaintiff masturbating." However, Pugh attempts to justify his conduct by pointing out that the plaintiff turned 18 years of age on February 9, 2013, a few months before he commenced his grooming activities. He casts the entire series of events alleged in the amended complaint as nothing more than a consensual negotiation for sexual favors between two adult males — scandalous, perhaps, but not contrary to law.

The plaintiff alleges that "no later than June 2013, defendant McMurtry received an email from plaintiff's Mother regarding inappropriate contact between plaintiff and defendant Pugh," and that on an unspecified date "no later than May 2013," McMurtry told the plaintiff's mother that she was aware of "the events, and that plaintiff's Mother's 'parental concerns had not been forgotten.'"

The plaintiff filed his complaint on June 5, 2014, identifying himself by the pseudonym "K.S." [*11] On that same date, the plaintiff filed a motion for a protective order and for leave to file under seal an affidavit identifying the plaintiff by his legal name. The Court granted that motion and entered a protective order allowing the plaintiff to proceed under a pseudonym and barring the parties from disclosing his identity unless allowed by further order of the Court. On

February 10, 2015, defendants Detroit Public Schools, Roy Roberts, Robert Bobb, Berry Greer, and Monique McMurtry ("the DPS defendants") filed their amended motion for judgment on the pleadings. Shortly thereafter, the plaintiff filed his motion to amend the complaint.

As to the DPS defendants, the plaintiff's proposed first amended complaint pleads eleven counts as follows. In the first group of counts, the plaintiff alleges that defendant Detroit Public Schools and its officials and administrators violated his rights under the *Due Process Clause* and *Equal Protection Clause of the Fourteenth Amendment*, contrary to *42 U.S.C. § 1983*, by failing to acknowledge or prevent defendant Charles Pugh's sexual abuse of the plaintiff, and by following a tacit municipal policy sanctioning the abuse. The complaint pleads mostly materially identical claims against defendants Detroit Public Schools (count I), Robert **[*12]** Bobb (count II), and Roy Roberts (count III). Similarly the amended complaint pleads Due Process claims only against defendants Berry Greer (count IV) and Monique McMurtry (count V). In the second group, the plaintiff alleges that those same defendants violated the Michigan Elliott-Larsen Civil Rights Act (ELCRA) by subjecting the plaintiff to, or allowing him to be subjected to, sexual harassment and gender discrimination. The amended complaint pleads identical claims under ELCRA against defendant DPS and each of five named individual defendants: Roy Roberts (count VII); Robert Bobb (count VIII), Berry Greer (count IX), Monique McMurtry (count X), and Charles Pugh (count XI). Next, the plaintiff pleads a claim of "gender harassment" under Title IX of the Education Amendments of 1972 against defendant DPS only (count XV).

In the remaining counts, the amended complaint separately pleads a federal constitutional claim against defendant Charles Pugh only, for violation of the *Due Process Clause* and *42 U.S.C. § 1983* (count VI), along with several state law claims for assault (count XII), battery (XIII), and intentional infliction of emotional distress (count XIV).

II.

A motion for judgment on the pleadings under *Federal Rule of Civil Procedure 12(c)* applies the same standards that govern motions to dismiss. **[*13]** *See Fed. R. Civ. P. 12(c)*; *Vickers v. Fairfield Med. Ctr., 453 F.3d 757, 761 (6th Cir. 2006)*; *Ziegler v. IBP Hog Mkt., Inc., 249 F.3d 509, 511-12 (6th Cir. 2001)*.

A defendant may test the legal sufficiency of a complaint

by moving to dismiss under *Rule 12(b)(6)*, by which the defendant implicitly concedes the truth of the pleaded facts for the purpose of the motion. *Rippy ex rel. Rippy v. Hattaway, 270 F.3d 416, 419 (6th Cir. 2001)* (citing *Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993)*). Under *Rule 12(b)(6)*, the complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008)*. "[A] judge may not grant a *Rule 12(b)(6)* motion based on a disbelief of a complaint's factual allegations." *Saglioccolo v. Eagle Ins. Co., 112 F.3d 226, 228-29 (6th Cir. 1997)* (quoting *Columbia Nat'l Res., Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995)*). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Tatum, 58 F.3d at 1109*; *Tackett v. M & G Polymers, USA, L.L.C., 561 F.3d 478, 488 (6th Cir. 2009)*. "To survive a motion to dismiss, [a plaintiff] must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal, [556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868] (2009)*." *Fabian v. Fulmer Helmets, Inc., 628 F.3d 278, 280 (6th Cir. 2010)*. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 557*).

Under the new regime ushered in by *Twombly* and *Iqbal*, pleaded facts must be accepted **[*14]** by the reviewing court but conclusions should not be accepted unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal, 556 U.S. at 681* (quoting *Twombly, 550 U.S. at 555*). However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian, 628 F.3d at 281* (quoting *Iqbal, 556 U.S. at 678*).

Consideration of a motion to dismiss under *Rule 12(b)(6)* is confined to the pleadings. *Jones v. City of Cincinnati, 521 F.3d 555, 562 (6th Cir. 2008)*.

Assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. _Wysocki v. Int'l Bus. Mach. Corp., 607 F.3d 1102, 1104 (6th Cir. 2010)_. However, "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." _Commercial Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 335 (6th Cir. 2007)_ (citing _Fed. R. Civ. P. 10(c)_); _see also Koubriti v. Convertino, 593 F.3d 459, 463 n.1 (6th Cir. 2010)_. Even if a document is not attached to a complaint or answer, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." _Commercial Money Ctr., 508 F.3d at 335-36_. If the plaintiff does not directly refer to a document [\*15] in the pleadings, but that document governs the plaintiff's rights and is necessarily incorporated by reference, then the motion need not be converted to one for summary judgment. _Weiner v. Klais & Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997)_ (holding that plan documents could be considered without converting the motion to one for summary judgment even though the complaint referred only to the "plan" and not its associated documents). In addition, "a court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." _Northville Downs v. Granholm, 622 F.3d 579 (6th Cir. 2010)_ (citing _Commercial Money Ctr., Inc., 508 F.3d at 335-36_).

In this case, the DPS defendants attached to their motion a log of the text messages that it appears the parties do not dispute were sent by defendant Pugh and the plaintiff to each other. The DPS defendants make several extended arguments based on this text message log, attempting to establish that the alleged misconduct could not have occurred either before the plaintiff's eighteenth birthday or on any day when school was in session. However, neither of those circumstances, even if true, is relevant to the analysis of the plaintiff's claims. Moreover, it appears that the defendants believe that the Court should take "judicial notice" of the record of [\*16] these text messages, because they were filed as an exhibit to the plaintiff's proof of claim in defendant Pugh's individual bankruptcy case. Although it is well established that federal "courts can take notice of the actions of other courts," generally "a court will recognize only indisputable court actions, such as the entry of a guilty plea or the dismissal of a civil action." _In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 468 (6th Cir. 2014)_ (citations and quotations omitted). Moreover, "a court cannot notice pleadings or

testimony as true simply because these statements are filed with the court." _Ibid._ The defendants have not offered any good reason why the Court should consider the materials they rely upon that go beyond the pleadings, and they have not asked the Court to convert their motion for judgment on the pleadings to one for summary judgment under Rule 56. Therefore, the Court will disregard the text message log in reaching the decision on the motion for judgment on the pleadings.

A. State Action

Most of the plaintiff's federal claims are based on _42 U.S.C. § 1983_. "To state a claim under _[section] 1983_, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused [\*17] by a person acting under the color of state law." _Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009)_ (quoting _Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir. 2006)_). The defendants contend that the incidents alleged in the complaint comprise purely private conduct that occurred off school grounds, and that Pugh did not rely on any official status or authority in his pursuit of the plaintiff for sexual favors. The plaintiff responds that the alleged harassment and abuse are inherently related to the exercise of Pugh's authority as president of the Pugh Leadership Forum and a volunteer teacher at the Douglass Academy, because but for those circumstances of his office he never would have had the opportunity to meet the plaintiff and develop a relationship with him. The plaintiff argues that because he was required to attend the Pugh Leadership Forum, the eventual harassment and abuse that followed was facilitated by Pugh's official position and fairly attributable to the actions (or inactions) of the school district and its administrators that required him to attend Pugh's classes.

Individuals will be "considered state actors for the purposes of _§ 1983_ only if their conduct that allegedly gave rise to the deprivation of the [plaintiff's] constitutional rights may be 'fairly attributable to the [\*18] State.'" _Marie v. Am. Red Cross, 771 F.3d 344, 362 (6th Cir. 2014)_ (quoting _Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982))_. As the Sixth Circuit has explained:

> In _Lugar_, the Supreme Court set forth a two-part test for determining whether the actions of a private party causing the deprivation of a federal right are attributable to the state. First, the deprivation must be caused by the exercise of some right or privilege

created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible. Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state.

*Phelps v. Dunn, 965 F.2d 93, 102 (6th Cir. 1992)*. In *Phelps*, the court of appeals held that a volunteer prison chaplain was a state actor, because the circumstances of the case showed that he exercised state authority, was bound to apply prison policies, and acted "within the institutional structure of chapel command." *Ibid.*

There is no dispute that the DPS defendants are all state actors, and the individual DPS defendants were acting under color of law. Whether Pugh acted under color of law in seeking sexual [*19] favors from the plaintiff, a DPS student, is a closer question. Although the plaintiff notes that Pugh is the former president of the Detroit City Council, he does not contend that Pugh's conduct qualifies him as a state actor by virtue of his exercise of the power or authority of that office. Instead, he contends that Pugh's contact with him occurred solely through Pugh's role as a volunteer teacher authorized to conduct a mandatory leadership class by the DPS.

According to the amended complaint, Pugh conducted leadership classes on the premises of the Douglass Academy, using school facilities, during school hours. DPS mandated the classes for all seniors as a condition of graduation. Pugh conducted the classes with the approval of the school board and the school administrators. It may be fairly inferred from these allegations that Pugh operated "within the institutional structure of [the DPS] command." The amended complaint contains allegations from which it could be found that the offending conduct was conducted "by a person for whom the [DPS] is responsible." The second part of the *Lugar* test can be satisfied by facts showing that Pugh "has obtained significant aid from state officials, [*20] or because his conduct is otherwise chargeable to the state." Here, the facts are somewhat congruent to those in *Phelps v. Dunn*, where the court of appeals held that a volunteer pastor was a state actor under *42 U.S.C. § 1983*. The DPS furnished Pugh with a classroom and made his class a requirement for graduation at the Douglass Academy. Although he was a volunteer, in all other material respects, Pugh was a

member of the faculty. His class met regularly, attendance was mandatory, and by dint of the DPS rules, his students in effect were a captive audience.

The plaintiff has pleaded sufficient facts to show that Pugh was acting under color of law within the meaning of *section 1983*.

B. Substantive Due Process

In counts I though V of the amended complaint, the plaintiff charges that the various DPS defendants violated his rights under the Due Process and *Equal Protection Clauses of the Fourteenth Amendment*. The due process component is based on an alleged deprivation of substantive due process. The DPS defendants argue that the substantive due process allegations fail as a matter of law because the specific conduct alleged — texting and a single incident where Pugh put his hand on the plaintiff's thigh — fall far short of the "conscience shocking" sort of sexual and [*21] abusive invasion of bodily integrity required to make out a cognizable due process claim. The defendants point out that a plaintiff's due process claim on similar facts was rejected in *Lillard v. Shelby County Board of Education, 76 F.3d 716, 725 (6th Cir. 1996)*.

The plaintiff responds that "sexual abuse" of a student by a teacher is inherently "conscience shocking," and that the Sixth Circuit has recognized that such claims can anchor a plausible substantive due process claim. The plaintiff contends that *Lillard* upheld a judgment of liability for the defendant's conduct with another student plaintiff, where he "fondled her breasts and buttocks," and he points out that there was no indication in *Lillard* that the defendant "touched the plaintiff underneath her clothes." The plaintiff asserts that the allegations that Pugh touched his thigh "while handing him money" are sufficiently sexually suggestive to be similar to the claims that the Sixth Circuit allowed to proceed in *Lillard*.

The Sixth Circuit has held that "'a schoolchild's right to personal security and to bodily integrity manifestly embraces the right to be free from sexual abuse at the hands of a public school employee.'" *Doe ex rel. Doe v. City of Roseville, 296 F.3d 431, 438 (6th Cir. 2002)* (quoting *Doe v. Claiborne County, 103 F.3d 495, 506 (6th Cir. 1996)*). Accordingly, "the *Due Process Clause of the Fourteenth Amendment* protects the right of a child to be free from sexual [*22] abuse inflicted by a public school teacher." *Ibid.* (citing *Claiborne County, 103 F.3d at 506*).

"Sexual abuse under color of law is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the _Due Process Clause_," and "the right to be free from such abuse [is] clearly established." _Ibid._ (citing _Claiborne, 103 F.3d at 507_). However, where the plaintiff proceeds on a theory of supervisory liability, he "'must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students.'" _Id. at 439_ (quoting _Claiborne County, 103 F.3d at 513_). "Put another way, . . . the plaintiff must show that the 'defendants' conduct amounted to a tacit authorization of the abuse.'" _Ibid._ That is because under _Section 1983_, a plaintiff must establish the liability of each individual defendant by that person's own conduct. _Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)_ ("Because vicarious liability is inapplicable to Bivens and _§ 1983_ suits, a plaintiff must plead that each Government-official defendant, [*23] through the official's own individual actions, has violated the Constitution."). "When suing an individual actor [] for constitutional violations under _§ 1983_, a plaintiff must demonstrate that the actor 'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself." _Flagg v. City of Detroit, 715 F.3d 165, 174 (6th Cir. 2013)_ (citing _Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999))_. "To prove acquiescence, it is not enough to show that the actor merely failed to act against misconduct of which he was aware." _Ibid._ (citing _Shehee, 199 F.3d at 300; Poe v. Haydon, 853 F.2d 418, 429 (6th Cir. 1988))_.

Here, the plaintiff has pleaded no facts sufficient to allege a violation of his substantive due process right to "bodily integrity." His only allegation of actual contact is the single incident in which defendant Pugh put his hand on the plaintiff's thigh. The plaintiff cites a number of the cases for the proposition that "sexual abuse" is _per se_ an actionable violation of the _Due Process Clause_. But he cites none in support of his argument that "adjusting the plaintiff's clothes" and touching the plaintiff's thigh while handing him money constitute "sexual abuse."

The plaintiff's reference to _Lillard_ does not help him. There, the Sixth Circuit held that fondling a female [*24] student's breasts and buttocks constituted sexual abuse. But in that same case the court of appeals observed, as to allegations against the same teacher by another plaintiff, that:

> [Defendant teacher's] rubbing of [plaintiff student's] stomach, accompanied by a remark that could reasonably be interpreted as suggestive, was wholly inappropriate, and, if proved, should have serious disciplinary consequences for [the teacher]. But without more, it is not conduct that creates a constitutional claim. It is highly questionable whether a single, isolated incident of this magnitude could even rise to the level of sexual harassment under Title VII. See _Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)_. Under no circumstances, then, can it amount to "a brutal and inhumane abuse of . . . official power, literally shocking to the conscience," sufficient to state a claim for the violation of substantive due process rights. [_Webb v. McCullough, 828 F.2d 1151, 1159 (6th Cir. 1987)_].

_Lillard, 76 F.3d at 726._

Because Pugh's conduct did not amount to a substantive due process violation, the DPS defendants cannot be held accountable for a constitutional deprivation as supervisors or by acquiescence. Cf. _Cartwright v. City of Marine City, 336 F.3d 487, 495 (6th Cir. 2003)_ (holding that "[b]ecause the City can only be held liable if there is a showing of liability on the part of its officials, the determination [*25] that the officers did not violate [the plaintiff's] constitutional rights resolves plaintiff's claim against the City as well").

C. Equal Protection

The defendants argue that the plaintiff has failed to state a cognizable equal protection claim, because he has not pleaded that, as a male student, he was treated any differently than any similarly situated female student. The defendants contend that the plaintiff cannot do so because the Douglass Academy was an all-male school.

The plaintiff responds that his claims explicitly are premised on "gender-based class discrimination," which occurred when the defendants subjected male students, and not female students, to Pugh's harassing and abusive conduct, by allowing him to conduct the Pugh Leadership Forum program at an all-boys high school. The plaintiff argues that gender-based discrimination is subject to "heightened scrutiny," and there cannot be any important or compelling reason that the defendants

2015 U.S. Dist. LEXIS 94312, *25

could have to justify such discrimination.

"The _Equal Protection Clause of the Fourteenth Amendment_ prohibits a state from denying to any person within its jurisdiction the equal protection of the laws." _S.S. v. E. Kentucky Univ., 532 F.3d 445, 457 (6th Cir. 2008)._ The Sixth Circuit has not ruled in a published decision on the precise question whether [*26] sexual harassment of a student by a teacher can support a claim for gender discrimination under _42 U.S.C. § 1983_ and the _Equal Protection Clause_, although it has upheld sexual abuse claims brought on a substantive due process theory, as noted earlier. However, the court of appeals' decisions on point suggest that sexual harassment is actionable on equal protection grounds, in appropriate circumstances. For example, in _Hayes v. Vessey, 777 F.2d 1149, 1153 (6th Cir. 1985)_, the court viewed the plaintiff's equal protection claim as "predicated on a theory that the defendants' failure to provide her with adequate security was the result, in part, of an intentional, discriminatory attitude towards her as a woman." The court found that there was insufficient evidence to support a jury verdict of liability on an equal protection claim only because plaintiff did not show that the sole remaining defendant's conduct caused her to be raped by a prison inmate. _See also Mann v. Univ. of Cincinnati, 114 F.3d 1188_ [published in full-text format at _1997 U.S. App. LEXIS 12482_], 1997 WL 280188, at *2 (6th Cir. 1997) (unpublished table decision) ("'[T]he record reveals that the jury had a sufficient basis to believe either plaintiff or Clemens. It obviously concluded that Clemens had not created a 'discriminatorily abusive . . . environment.'"). And the court stated in _Klemencic v. Ohio State Univ., 1997 U.S. App. LEXIS 8117, 1997 WL 189502 (6th Cir. 1997)_ (unpublished table decision):

> It is undisputed [that] "sexual harassment [*27] by government employers would violate the rights protected by the _equal protection clause_." _Poe v. Haydon, 853 F.2d 418, 429 (6th Cir. 1988)_ (citing _Huebschen v. Department of Health and Soc. Servs., 716 F.2d 1167, 1172 (7th Cir. 1983)_ ("sexual harassment . . . directed solely at the plaintiff because she was a woman" violates the _equal protection clause_)), _cert. denied, 488 U.S. 1007, 109 S. Ct. 788, 102 L. Ed. 2d 780 (1989)_. . . . "[T]here is no doubt that the right to be free from sex discrimination is protected by the _equal protection clause_ of the [F]ourteenth [A]mendment." _Poe, 853 F.2d at 432_.

_Klemencic, 1997 U.S. App. LEXIS 8117, 1997 WL_

_189502, at *2_.

The Seventh Circuit has held that "sexual abuse by a teacher can deprive a student of his or her right to equal protection under the law." _T.E. v. Grindle, 599 F.3d 583, 587 (7th Cir. 2010)_. As the Seventh Circuit explained, alleged sexual abuse of a student by a teacher suffices to state a plausible claim under the _Equal Protection Clause of the Fourteenth Amendment_, and the plaintiff's claim will be sufficiently pleaded to defeat a school supervisor's qualified immunity defense where the student alleges that the supervisor knew about the abuse and deliberately covered it up. The court held that the plaintiff need not "prove discriminatory intent [by showing that] male and female victims were treated differently." _599 F.3d at 588_. Instead it was enough to show that the teacher (a state actor) "denied the girls equal protection by molesting and abusing them." _Ibid._ The court based these conclusions on the premise "that the _Equal Protection Clause_ does not require that the state actor be motivated solely by the plaintiff's membership [*28] in a protected class." _Id. at 589_. However, the court required the challenged decisions to have at least some component of class-based differentiation. The court explained: "Even if [the principal] was motivated in part by a desire to avoid disciplining teachers in general, she could still be held liable if she treated the plaintiffs' claims differently because they were made by girls targeted for sexual abuse." _Ibid._

In this case, the plaintiff may have pleaded sufficient facts to allege plausibly that Pugh's conduct constituted unlawful sexual harassment and gender discrimination contrary to the _Equal Protection Clause_. See _Poe v. Haydon, 853 F.2d 418, 429 (6th Cir. 1988)_ ("sexual harassment by government employers would violate the rights protected by the _equal protection clause_"). But he has not pleaded sufficient facts to show that the other individually named defendants are liable for that discrimination. Pugh evidently does not dispute that he made repeated, explicit, insistent demands by text messaging for the plaintiff to perform sexual favors in exchange for money and other gifts. That conduct may constitute harassment of an explicitly sexual nature. But as to defendants Bobb, Roberts, Greer, and McMurtry, the plaintiff has not alleged any facts to show that they either failed [*29] or refused to respond to the plaintiff's or his mother's complaints because he was a male student, that his complaints of sexual harassment were mischaracterized or obfuscated, or that similar complaints by female students were treated differently. _Cf. T.E. v. Grindle, 599 F.3d 583, 587 (7th Cir. 2010)_ ("a

jury could conclude that by attempting to convert claims about sexual abuse by [the teacher] into complaints about teaching methods, [the principal] treated the girls' complaints differently because of their sex").

The plaintiff argues that he has alleged that DPS administrators were "aware of Pugh's persistent sexual harassment of students," and that they nevertheless allowed him to operate his program at the Douglass Academy and compelled the plaintiff to attend program sessions. The plaintiff argues that the school district's "policy" of ignoring complaints about Pugh's behavior was the "moving force" behind the plaintiff's injury, because "Pugh was able to abuse [the plaintiff] without fear of reprisal." However, the plaintiff has failed to plead sufficient facts to state a plausible claim that defendants Roberts, Bobb, Greer, or McMurtry are subject to supervisory liability under *42 U.S.C. § 1983*, because he has not alleged any facts sufficient [*30] to show that they "encourag[ed], implicitly authoriz[ed], approv[ed] or knowingly acquiesc[ed] in the misconduct." *Flagg v. City of Detroit, 715 F.3d 165, 174 (6th Cir. 2013)* (citing *Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999))*. The plaintiff has alleged, at most, that the individual defendants knew about the alleged incidents and did nothing. However, "[t]o prove acquiescence, it is not enough to show that the actor merely failed to act against misconduct of which he was aware." *Ibid.* (citing *Shehee, 199 F.3d at 300; Poe, 853 F.2d at 429*).

As to defendants Roberts and Bobb, the plaintiff has failed to plead any specific facts to show that they knew of specific past incidents of sexual harassment or misconduct by Pugh against other students, other than in the undeveloped and vague allegations that members of the school board had "informed" Roberts and Bobb of Pugh's "tendencies towards pedophilia and sexual abuse and harassment of school-aged boys." The plaintiff does not allege that anyone discussed with any of the named defendants any actual incidents of "pedophilia" or "sexual abuse and harassment of school-aged boys," other than when the plaintiff's mother contacted McMurtry. And as to that contact, the complaint does not allege that the plaintiff's mother discussed anything with McMurtry other than her concerns about Pugh's contact with the plaintiff himself. As to Roberts [*31] and Bobb, the plaintiff alleges that "there was a clear and persistent pattern of abuse, and despite the fact that [the defendants] had actual knowledge that plaintiff could not protect himself from defendant Pugh's sexual misconduct, [they were] deliberately indifferent to known facts which

demonstrated an unreasonable risk to plaintiff's safety such that [the defendants] tacitly approved, condoned, tolerated, [or] acquiesced in the deprivation of plaintiff's constitutional rights." Am. Compl. ¶¶ 86, 107. But he does not recite any "known facts" to illustrate the existence of any "pattern" of abuse, other than the sparse allegations of text messaging "harassment" and one incident of touching that occurred sometime during May and June 2013. That, however, is not enough to show encouragement, approval, or implicit authorization.

As to defendants Greer and McMurtry, the plaintiff alleges nothing more than that those defendants "failed to monitor" Pugh's conduct, did not conduct a background check on him before allowing the Pugh Leadership Forum program to be conducted at the school, and failed to ensure "that a certified teacher was present while students were receiving instruction," [*32] and that they "became aware of the inappropriate contact defendant Pugh had with plaintiff," but "failed to take corrective action to prevent defendant Pugh's conduct." The plaintiff alleges that McMurtry received an email from the plaintiff's mother in June 2013 and had some other contact during May 2013, in which she reassured plaintiff's mother that her "parental concerns" were not forgotten. But he alleges nothing in the way of facts to show that McMurtry or Greer did anything other than failing to respond to the complaints after becoming aware of them.

The amended complaint fails to state a *section 1983* claim against the individual DPS defendants based on the *Equal Protection Clause*.

D. Title IX

The defendants argue that the plaintiff has failed to allege an actionable claim under Title IX because (1) the alleged "abuse" by defendant Pugh falls far short of the severe, pervasive, and egregious conduct over long spans of time that has been found actionable in Title IX cases; (2) there are no allegations that defendants Roberts, Bobb, or Greer received "actual notice" of the alleged abuse; (3) the plaintiff's vague allegation that defendant McMurtry received notice at an unspecified date "no later than May 2013" makes [*33] it impossible to evaluate the reasonableness of any response she might have made at any particular time; (4) the plaintiff has not established that the misconduct occurred in a setting under the control of any named defendant, because all the alleged incidents took place off school grounds and outside school hours; and (5) the record of text messaging between Pugh and the plaintiff plainly

shows that the negotiation for sexual favors was consensual and not at all "unwelcome." For these last two points, the defendants again rely substantially on their analysis of the message log exhibits, which the Court disregards.

The plaintiff responds that he has alleged harassment that was "severe" and "pervasive," because he alleges "that Pugh's harassment began early in the 2012 school year," when Pugh "looked at him in a sexually suggestive way," which the plaintiff's classmates noticed and teased him about. The plaintiff contends that the harassment escalated later in the year when Pugh touched the plaintiff while clothes shopping and while sitting in his car, and then persistently urged the plaintiff to make sexual movies for him in exchange for money and gifts. The plaintiff contends that [*34] the fact that misconduct occurred off school grounds is not dispositive of the plaintiff's claims, and the implication that the plaintiff "consented" to the abuse is simply a red herring and irrelevant to the Title IX analysis. The plaintiff further argues that he plainly alleges actual notice of the misconduct and deliberate indifference in his amended complaint, based on affidavit testimony by two DPS school board members, in which they state that they informed defendants Roberts and Bobb of Pugh's "tendency" toward "pedophilia," and the allegations that those defendants overrode a decision by the school board barring Pugh from conducting his program at the Douglass Academy.

Title IX of the Education Amendments of 1972 "provides that 'No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Williams ex rel. Hart v. Paint Valley Local Sch. Dist., 400 F.3d 360, 366 (6th Cir. 2005)* (quoting *20 U.S.C. § 1681(a)*). "This includes the duty not to discriminate on the basis of sex, which encompasses a teacher's sexual harassment of a student." *Ibid.* (citing *Gebser v. Lago Vista Independent School District, 524 U.S. 274, 282, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)*). "In *Gebser*, which involved the harassment of a student by a teacher, it was established by the Supreme Court that a school [*35] district can be held liable in damages for the sexual harassment if it is proven that the school district had actual notice and exhibited deliberate indifference to the alleged harassment." *Ibid.* (citing *Gebser, 524 U.S. at 292*). "*Gebser* explained that deliberate indifference of a school district is shown where there is an official or other person with authority to take corrective action, who has actual knowledge of

the abuse, and fails adequately to respond." *Ibid.* (quotation marks and citations omitted).

However, school officials may be "deemed 'deliberately indifferent' to acts of [] harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis ex rel LaShonda D. v. Monroe County Bd. of Educ., 526 U.S. 629, 648, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)*. Although *Davis* concerned "student-on-student" harassment, the Sixth Circuit has held that the same "deliberate indifference" standard announced by the Supreme Court in that case also applies to teacher-on-student cases. *Williams, 400 F.3d at 367* ("It is clear from a reading of *Gebser* and *Davis*, that the Court is discussing only one standard for 'deliberate indifference' in Title IX pupil harassment cases and not, as [the plaintiff] contends, one standard for student-on-student harassment and a less stringent [*36] standard for teacher-on-student harassment.").

The plaintiff has pleaded sufficient facts plausibly to allege that the responses of defendants Roberts, Bobb, Greer, and McMurtry were "clearly unreasonable in light of the known circumstances" before the alleged events of May and June 2013, such that their responses constituted "deliberate indifference" to the plaintiff's complaints. The Supreme Court explained in *Gebser v. Lago Vista Independent School District, 524 U.S. 274, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)*, that "deliberate indifference of a school district is shown where there is an official or other person with authority to take corrective action, who has actual knowledge of the abuse, and fails adequately to respond." *Id. at 292* (quotations and citations omitted). School officials may be "deemed 'deliberately indifferent' to acts of [] harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis ex rel LaShonda D. v. Monroe County Bd. of Educ., 526 U.S. 629, 648, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)*. Here, the plaintiff has alleged that the defendants were informed by school board members in the fall of 2012 that Pugh had tendencies toward pedophilia, sexual abuse, and harassment of school-aged boys. The plaintiff alleged in the amended complaint that despite this knowledge, they did nothing.

In this day [*37] and age, warnings that a teacher is prone to inappropriate attractions to students should have set off alarm bells. Instead, both emergency managers and the Douglass Academy administrators

allowed Pugh unfettered access to male students. They did not investigate the allegations, or so much as perform a background check. They mandated participation in his leadership class, and they allowed him to block the windows to his classroom so as to prevent onlookers from observing him in class. And as it turned out, smoke portended fire.

The conduct of the administrators, charged with the care and education of young men, is baffling. And the safety of the students aside, the emergency managers, charged with running a school district in financial distress, should have been sensitive to the potential impact of an adverse judgment that Pugh's conduct might provoke.

The Court is satisfied that the plaintiff has pleaded facts in the amended complaint from which a jury could find that the DPS defendants' response to fair warnings about Charles Pugh's exposure to students was plainly unreasonable, and they were deliberately indifferent to potential harm.

E. State Law Claims

The plaintiff has included counts [*38] under Elliott-Larsen Civil Rights Act, *Mich. Comp. Laws § 37.2101 et seq.*, which prohibits any educational institution from "[d]iscriminat[ing] against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, or sex." *Mich. Comp. Laws § 37.2402(a)*. The Act defines the term "educational institution" to "mean[] a public or private institution, or a separate school or department thereof," including any "academy, college, elementary or secondary school, [or] local school system," as well as any "agent of an educational institution." *Mich. Comp. Laws § 37.2401*. "Discrimination because of sex includes sexual harassment." *Mich. Comp. Laws § 37.2103(i)*. The definition of sexual harassment includes "conduct or communication [that] has the purpose or effect of substantially interfering with an individual's . . . education, . . . or creating an intimidating, hostile, or offensive . . . educational . . . environment." *Ibid.*

The defendants argue that the plaintiff cannot establish that the sexual communications and conduct Pugh engaged in were "unwelcome," because the plaintiff's text messages show that he welcomed or at least consented to Pugh's advances. The defendants argue, moreover, [*39] that the plaintiff has failed to show how a handful of isolated incidents of conduct over the

course of a single weekend, that took place off school grounds and after school hours, in any way "permeated" the school environment or substantially interfered with the plaintiff's education.

The plaintiff responds that he has alleged his Elliott-Larsen claims adequately, based on the same facts discussed above in relation to his due process, equal protection, and Title IX deliberate indifference claims. The plaintiff argues that he has established that the alleged harassment substantially interfered with his education, based on his allegations that he "lost interest" in his education, "paid less attention" during the remainder of the school year after the harassment, has found it difficult to hold a job or trust anyone, and ultimately abandoned his plans to attend university or community college as a result of his feelings about the events.

The elements of a *quid pro quo* sexual harassment claim are "(1) that [the plaintiff] was subjected to any of the types of unwelcome sexual conduct or communication described in the statute and (2) that the public service provider or the public service provider's [*40] agent made submission to the proscribed conduct a term or condition of obtaining public services or used the plaintiff's submission to or rejection of the proscribed conduct as a factor in a decision affecting his or her receipt of public services." *Hamed v. Wayne County, 490 Mich. 1, 10, 803 N.W.2d 237, 244 (2011)*.

In order to establish a *prima facie* case under the hostile environment theory, the plaintiff must allege that: (1) he belonged to a protected group; (2) he was subjected to communication or conduct on the basis of sex; (3) he was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the student's access to education or created an intimidating, hostile, or offensive educational environment; and (5) *respondeat superior*. *Radtke v. Everett, 442 Mich. 368, 382-83, 501 N.W.2d 155, 162 (1993)* (citing *Mich. Comp. Laws §§ 37.2103(h), 37.2202(1)(a)*). The first element will be satisfied where the plaintiff shows that he is a student "who has been the object of unwelcomed sexual advances," since "all [students] are inherently members of a protected class in hostile [] environment cases because all persons may be discriminated against on the basis of sex." *Id. at 383, 501 N.W.2d at 162*. The second element likewise will be satisfied where the plaintiff "alleges that [he] was subjected [*41] to

harassment on the basis of sex." *Ibid.*

Pugh's alleged persistent demands for sexual favors certainly suffice to constitute "unwelcome sexual advances, requests for sexual favors, [or] other verbal or physical conduct or communication of a sexual nature." *Mich. Comp. Laws § 37.2103(i)*. The DPS defendants' argument that the advances were welcome requires a factual evaluation, and relies on materials that are beyond consideration in the present motion.

There may be some question whether the plaintiff can show that submission to the conduct or communication was made a term or condition of his obtaining education; that submission to or rejection of the conduct or communication was used as a factor in decisions affecting his education; or that the conduct or communication had the effect of substantially interfering with his education or "creat[ed] an intimidating, hostile, or offensive [educational] environment." *Ibid.* However, the plaintiff has alleged that he "paid less attention during the 2012-2013 school year," and that he "had planned on attending college following his high school graduation, but because of Pugh's abuse and harassment, has been unable to do so." Because Pugh's class was a graduation requirement, and [*42] the plaintiff has alleged that Pugh emphasized that the attention he paid to the plaintiff was geared to directing him toward success in life, those allegations are sufficient to satisfy this element of the hostile work environment form of sexual harassment.

The DPS defendants also argue that the plaintiff failed to allege the *respondeat superior* element of a sexual harassment claim. In their brief, they delve into an hour-by-hour analysis of the text messaging logs in an attempt to establish that the plaintiff cannot show that any of the individual defendants knew of the alleged misconduct and failed to prevent it, since the logs establish that the specific incidents alleged first began on the evening of May 31, 2013 (a Friday), and that they ended on June 3, 2013 (Monday), one day before the plaintiff's mother asserts that she discovered and reported Pugh's inappropriate contact with her son to defendant McMurtry. The defendants argue that it is not alleged that any of them knew anything about the misconduct before June 4, 2013, and there was nothing that they could have done about it over the previous weekend.

Under Michigan law, "[w]hen the harassment was committed by an agent and the [*43] plaintiff is pursuing a civil rights claim against the principal . . . a court must

[] determine the extent of the employer's vicarious liability." *Radtke, 442 Mich. at 382-83, 501 N.W.2d at 162* (quotation marks omitted). "Thus, if a defendant is not vicariously liable for the acts of its agent under traditional principles of respondeat superior, the plaintiff's claim under [ELCRA] fails as a matter of law." *Ibid.* The general rule is that an employer is responsible for his employee's conduct performed within the scope of the employment engagement. *Zsigo v. Hurley Med. Ctr., 475 Mich. 215, 221 716 N.W.2d 220, 223 (2006)*. The Michigan courts define "'within the scope of employment' to mean 'engaged in the service of his master, or while about his master's business.'" *Hamed, 490 Mich. at 11, 803 N.W.2d at 244* (footnote omitted). Aside from that general rule, however, "an employer can be held liable for its employee's conduct if the employer knew or should have known of the employee's propensities . . . before that employee committed an intentional tort." *Id. at 12, 803 N.W.2d at 245* (footnote omitted). This foreseeability question, the Michigan Supreme Court has explained,

> involves an analysis of whether an employer had (1) actual or constructive knowledge of prior similar conduct and (2) actual or constructive knowledge of the employee's propensity to act in accordance [*44] with that conduct.

*Ibid.*

The amended complaint does not allege specific facts to show that Pugh engaged in any past relevant instances of similar conduct. However, that form of specificity is not fatal to the case at the pleading stage, where the plaintiff alleges that the defendants were told specifically of Pugh's tendency toward pedophilia and harassment of young boys.

The plaintiff has stated a proper claim under Michigan's Elliott-Larsen Civil Rights Act.
III.

The Court has analyzed the DPS defendants' motion for judgment on the pleadings as applied to the amended complaint. That is appropriate, since the defendants' only objection to the amendment is based on futility. They argue that the proposed amended complaint is insufficient for the same reasons that they contend they are entitled to judgment as a matter of law on the claims in the original complaint. And to the extent that the Court has granted in part the motion for judgment on the pleadings, the defendants largely are correct. A court may deny a motion for leave to amend when the

proposed amendment would be futile. *Head v. Jellico Housing Auth., 870 F.2d 1117, 1123 (6th Cir. 1989); Martin v. Associated Truck Lines, Inc., 801 F.2d 246, 248 (6th Cir. 1986); Neighborhood Dev. Corp. v. Advisory Council on Historic Pres., 632 F.2d 21, 23 (6th Cir. 1980)*. However, because some of the counts survive that motion, and the proposed amended complaint dispenses [*45] with the claims in the original complaint under the Michigan Child Protection Act, which otherwise have not formally been dismissed and which the parties have not litigated, the Court finds the amendment is proper. Rule 15(a)(2) provides that "[t]he court should freely give leave when justice so requires." The motion to amend the complaint will be granted.

IV.

For the reasons state above, the plaintiff has not stated claims in his proposed amended complaint against the Detroit Public Schools defendants for which relief can be granted under *42 U.S.C. § 1983*. He has stated valid claims against those defendants under Title IX and the Michigan Elliott-Larsen Civil Rights Act. The motion to amend the complaint is meritorious.

Accordingly, it is **ORDERED** that the plaintiff's motion for leave to amend the complaint [dkt. #56] is **GRANTED**. The proposed amended complaint attached as Exhibit 1 to the plaintiff's motion is **DEEMED FILED**.

It is further **ORDERED** that the motion by the Detroit Public Schools defendants for judgment on the pleadings [dkt. #31] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that counts I, II, III, IV, and V of the amended complaint are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** in all other [*46] respects.

/s/ David M. Lawson

DAVID M. LAWSON

United States District Judge

Dated: July 21, 2015

End of Document