UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA MAYS, et al.,

                Plaintiffs,              Case No. 5:15-cv-14002-JCO-MKM

v.                                  Judge John Corbett O'Meara

RICK SNYDER, et al.,            Mag. Judge Mona K. Majzoub

                Defendants.        CLASS ACTION

_____/

**MDEQ DEFENDANTS' MOTION FOR CHANGE OF VENUE**
**\*ORAL ARGUMENT REQUESTED\***

Current and former employees of the Michigan Department of Environmental Protection ("MDEQ"), Defendants Stephen Busch, Patrick Cook, Michael Prysby, Liane Shekter Smith, Adam Rosenthal, Bradley Wurfel, and Daniel Wyant (collectively, the "MDEQ Defendants"), by and through their counsel of record, and pursuant to the Court's general supervisory power, the Fifth and Seventh Amendments to the United States Constitution, and 28 U.S.C. § 1404(a), move for a transfer of venue because the local media's overwhelming and adverse publicity of this matter has made it nearly impossible for a fair and impartial jury to be empaneled in this Judicial District and, perhaps, the State of Michigan:

1.     Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. It has long been recognized that both

1

civil and criminal defendants are entitled to a fair trial by an impartial jury. This right is sacrosanct. Where the right is jeopardized due to substantial amounts of adverse pretrial publicity and community bias, courts (especially federal courts wielding broad supervisory power) must take protective measures such as changing venue.

2.     As explained by Dr. Bryan Edelman, a top expert on adverse publicity and juror bias, potential jurors exposed to significant quantities of inflammatory publicity and hostile community sentiment are likely to form preconceived attitudes and opinions regarding both litigants and triable questions of fact. (*See* Declaration of Dr. Bryan Edelman, attached as **Exhibit A**.) Once formed these case-specific attitudes and opinions are not readily subject to change and actually negatively alter the way in which jurors cognitively process evidence during the course of trial. (*Id.* ¶¶ 16-30.) As one popular juror statement goes, "you can't forget what you hear and see." (*Id.* ¶¶ 69, 90.)

3.     It thus follows that in those rare cases where "there is massive media coverage and pervasive prejudice within the jury pool, *voir dire* does not serve a reliable prophylactic measure for protecting a defendant's due process rights." (*Id.* ¶ 66.) In his Declaration, Dr. Edelman explains at length the ineffectiveness of *voir dire* in cases of exceptional adverse publicity and juror bias. (*Id.* ¶¶ 66-91.) Consequently, in the face of widespread negative news coverage and galvanized community prejudice, it is incumbent on courts to transfer venue at the outset of a proceeding. (*Id.* ¶¶ 5, 66, 91, 111-13.) This is especially true where, as here, there exists no reason to believe prejudicial media coverage in an adversely-affected and

2

hostile community will subside leading up to a sensational trial. (*Id.* ¶¶ 31, 34, 112.) Failure to change venue promptly in such cases, (a) deprives the eventual transferee court of the rightful duty to manage and shape the case ultimately tried; and (b) greatly prejudices defendants where failed attempts to empanel juries and resultant venue changes on the eve of trial attract enormous and unfortunately-timed adverse media coverage.

4.     In this case, news broke of potential lead contamination in Flint almost two years ago, and the Flint water "crisis" was born. The news accounts, which are too great in number to fully categorize here, have included front page pictures, featured stories, in-depth analyses, editorials, letters to the editors, pictures of key individuals, and biting political cartoons, and have described the situation in Flint as a public health disaster, drinking water emergency, regulatory failure and cover-up, and even a moral failure of astronomic proportions inflicted on a poor and primarily African-American community.[1] The matter has been heavily politicized and sensationalized. As described in further detail below, both the *quality* and *quantity* of the media reports have been extremely prejudicial to Defendants, particularly the MDEQ Defendants, and caused tremendous juror prejudice throughout most the State of Michigan.

## CONTENT OF THE ADVERSE PUBLICITY

5.     The content of the coverage saturating the State (particularly the Eastern District) refers to indifferent and racist state bureaucrats who in callous

---

[1] An appendix summarizing just a small fraction of this prejudicial news coverage is attached as **Exhibit B**.

disregard of public safety decided to use tainted and corrosive Flint River water resulting in the lead poisoning of thousands, unacceptably high levels of lead in children, a deadly Legionnaires' outbreak, civil lawsuits, criminal charges, and general distrust and distress among Flint's citizens.

6. **Lead Poisoning**: Provocative stories from local media have uniformly described exposure to "high levels" of "lead" in Flint's drinking water as a "mass" "poisoning" caused by government officials.[2] One example comes from a January 21, 2016 *MLive* story entitled: "HOW GOVERNMENT POISONED THE PEOPLE OF FLINT." (*Id.* ¶ 95.) As if the headline was not prejudicial enough, the story was preceded by the following collage depicting dirty water, poisoned children, and an outraged community:



7. The story begins with the premise that: "Flint water has poisoned more than just its children . . . It's poisoned the citizenry's faith in government." The article then quotes statements from Flint residents one of who commented:

---

[2] *See* Ex. B ¶¶ 3, 7-8, 10, 14-15, 17, 32, 38, 48, 49, 55, 60, 68, 73, 75, 77, 79-81, 89-90, 95, 101, 103, 106-07, 118, 122, 131-32, 135-37, 141, 149-50, 152, 157, 159-65, 173, 175, 182, 185, 188, 191, 194, 197, 199, 203, 206, 209, 214-15, 217-18, 222-23, 227, 231, 233,  235-36, 238-39, 241.

"Somebody needs to go to jail for this, man . . . They're poisoning an entire community. A generation of kids will never recover from this.  And it's all just to save a few dollars. They played a game of chess with our lives and we lost." (*Id.*)

8.     Among many other prejudicial tales, the article then describes Flint as "something out of a disaster movie"; compares Flint water to "toxic waste"; says that Flint water may "have tainted a generation of Flint children"; reinforces myths that Flint water was "too corrosive for General Motors to build cars"; states that public officials "turned a blind eye to the problem"; portrays a picture of a vast government conspiracy and cover-up; and then highlights the resignations, firings, and apologies of several Defendants in this case. (*Id.*)

9.     **Legionnaires' Outbreak**: Local media accounts have blamed the outbreak of Legionnaires' disease and resulting deaths on Flint water[3] even though there is no scientific basis for such allegations and despite contrary findings by the Center for Disease Control ("CDC"), United States Environmental Protection Agency ("EPA"), and others. For example, the *Detroit Free Press* on January 22, 2016, published an article entitled: "LEGIONNAIRES' EXPERT BLAMES SPIKE IN CASES ON FLINT WATER." (*Id.* ¶ 180.) A close inspection of the text of the article reveals that the alleged national expert has no scientific evidence to support her aspersions. (*Id.*)

10.     Similarly, on February 4, 2016, the *Detroit News* published an article entitled: "MICHIGAN OFFICIALS WARNED OF WATER, LEGIONNAIRES'

---

[3] *Id.* ¶¶ 1, 10, 13-14, 21, 25-26, 29, 32-34, 37, 41, 55, 66, 70, 88-90, 95, 100, 102, 107, 134, 163, 175, 178, 180, 182-83, 191, 193-94, 198-99, 202, 222, 233, 236.

LINK." (*Id.* ¶ 88.) This investigative-styled article, like many others, sifts through the emails of several government officials (including Defendants) and then implies knowledge of and disregard for an alleged connection between Flint water and the outbreak of Legionnaires disease. (*Id.*) A careful review of the text, however, shows that each time reference is made to the alleged "link" between Legionnaires disease and the Flint river water, it is preceded by the qualifiers such as "possible," "likely contributed," and "likely came from." (*Id.*)

11.    **Portrayals of MDEQ Defendants**: Media coverage of Flint's switch to the Flint River as its drinking water source and subsequent developments has provoked and inflamed community opinion and unfairly depicted the MDEQ Defendants as indifferent or bumbling bureaucrats, criminals, and even racists. In their reports, the local media has blamed the MDEQ Defendants, early and often, describing their conduct as "grossly negligent" and "criminal." They have reported that the MDEQ Defendants "purposely" or "recklessly disregarded" water regulations, "incompetently" failed to require corrosion treatment, "devised" ways to avoid detecting lead when collecting water samples, instructed Flint officials to "throw out" lead data, refused to follow testing protocols, "ignored warning signs," and failed to exercise "common sense."[4]

12.    There has been almost no mention of exculpatory evidence or the presumption of innocence, and the fact that all these allegations are or will be contested has not been paid lip service by the media.

---

[4] *Id.* ¶¶ 15, 17, 65, 79-80, 84, 87, 89-92, 100, 102-06, 110, 152, 161, 172, 175-76, 181-82, 184-85, 188, 190-93, 199, 201, 204-09, 211, 215, 217-18, 222, 224.

13.     Some of the most powerful reporting has occurred when several of the MDEQ Defendants were charged with crimes by prospective gubernatorial frontrunner and current Attorney General, Bill Schuette, and his special prosecutor, Todd Flood.[5] In such accounts, the media pasted images of each Defendant standing before a court to face the criminal allegations, surrounded by the flashing lights of reporters, and/or evoking Fifth Amendment Rights. (*Id*.) The media even slapped pictures the MDEQ Defendants on an October 4, 2016 article entitled "AMID WATER CRISIS, FLINT FACES A SHIGELLOSIS OUTBREAK," a matter having absolutely nothing to do with Flint water. (*Id*. ¶ 243.)

14.     If such coverage was not already prejudicial enough, adding further insult and prejudice against the MDEQ Defendants is the fact that headline stories contain Defendant Snyder's views that the MDEQ Defendants are responsible for the Flint water "crisis."[6] For example, the *Detroit News* in an article dated April 11, 2016 reported under the headline of "SNYDER: CAREER BUREAUCRATS TO BLAME FOR FLINT CRISIS" as follows: "Gov. Rick Snyder on Monday laid blame for Flint's water crisis on 'career bureaucrats' with an 'an absolute lack of common sense.'" (*Id*. ¶ 188.)

15.     Media coverage has also latched on to conjecture that the decisions leading to Flint's water woes, as well as the State's response to the community, have been racially discriminatory. A common sentiment in media accounts is that

---

[5] *Id*. ¶¶ 103-04, 107, 165-67, 169, 172-73, 181, 183, 190, 193, 198, 202,  217, 221.

[6] *Id*. ¶¶ 172, 175, 181, 188, 194, 209, 218, 238, 245.

if Flint had been richer or whiter, the decision to switch to the Flint River never would have occurred. (*Id.* ¶¶ 75-76, 79, 102, 118, 194, 214, 241.)  For example, Crain's Detroit Business reported on United States Senator Debbie Stabenow's statements that "there's no doubt" in her mind that if the water problem had occurred in a wealthy, white community, the State would have responded immediately. (*Id.* ¶ 79.) More recently, a Democratic lawmaker from Flint accused leaders in Congress of "refusing to approve emergency aid for the city's water crisis because a majority of Flint residents are African Americans." (*Id.* ¶ 76.)

16.    The Flint water "crisis" has continually been called an instance of "environmental racism." Headlines have declared: "OFFICIALS TO HEAR TESTIMONY OVER DISCRIMINATION CLAIMS SURROUNDING THE FLINT WATER CRISIS," "HOW RACE, CLASS SET THE STAGE FOR FLINT WATER CRISIS," and "FLINT LOOKS FOR RACIAL BIAS, WATER CRISIS LINK." (*Id.* ¶¶ 74, 75, 198.)

17.    Perhaps the most racially charged, inflammatory, and prejudicial statements broadcasted to date are those that have compared the current situation to some of the most horrific atrocities in history. The ACLU of Michigan has irresponsibly called the lead poisoning "genocide," a sentiment echoed by several celebrities. (*Id.* ¶¶ 194, 196-97.) The Michigan President of the "National Action Network" has been quoted as saying Flint water is "almost as bad as gas chambers for Jews." (*Id.* ¶ 196.) Other media reports have compared the Flint water crisis to an act of "terrorism," "Saddam Hussein," and "Watergate." (*Id.* ¶¶ 77, 194, 218,

8

236, 241.) Cries of "remember Tuskegee" have reverberated through social media, public protests, and public hearings. (*Id.* ¶¶ 163, 195.)

18. **Citizen Distress and Distrust**: Local media outlets have capitalized on every powerful human emotion available: shock, fear, anxiety, anger, trust, sympathy, and grief. Distrust and questions regarding the integrity and competence of the MDEQ have been rampant.[7] People in Flint, supported by celebrities and politicians, have called for the resignations, firings, and arrest of all involved.[8] The resultant resignations, firings, and arrests have received ample coverage.[9]

19. The media, in more recent stories, has focused on the alleged uncertainty and stress created by the alleged poisoning. The *Detroit Free Press* on page 1 of its Sunday edition of August 7, 2016, under the headline "FLINT'S GROWING MENTAL HEALTH CRISIS" reported that: "[a] widespread concern for residents throughout the lead-poisoned city is not knowing how they, or their children and grandchildren, may be impacted because of exposure to the contaminated water." (*Id.* ¶ 81.) As a result, the article says Flint residents "are experiencing mental health issues caused by the ongoing water crisis, including stress, anxiety and fear . . . ." (*Id.*) The article also says that "[d]istrust of government officials remains rampant" and Flint residents "don't believe it when

---

[7] *Id.* ¶¶ 30, 49, 58-59, 75, 77, 81, 88, 100, 102, 106, 120-23, 137, 149, 152, 158, 162-65, 171, 182-83, 196-97, 199, 213, 219, 228, 231, 233, 242-43.

[8] *Id.* ¶¶ 22, 58, 77, 88, 92, 127, 131-32, 134-35, 140, 160-61, 168, 181, 188, 194, 199, 208, 213-15, 223, 235-36, 238, 240.

[9] *Id.* ¶¶ 8, 13-14, 26, 59, 77, 88, 90-92, 101, 106, 127, 131, 135, 140, 160-61, 168-70, 172, 189-94, 199, 207, 217, 221, 238, 242.

they are told the [water] filters make water safe from the lead when properly used, pointing out they once were told there water was safe when it wasn't." (*Id.*)

20.     **Civil Lawsuits**: Not surprisingly, numerous lawsuits (including multiple class actions) have been filed in various courts against the City of Flint and its Emergency Managers, the State of Michigan, the Governor and State employees, professional consultants, and potentially against the EPA. This flood of lawsuits brought by personal injury lawyers from across the Country has provoked extensive news coverage in Michigan.[10]

21.     As one April 14, 2016, *Michigan Radio* article entitled "OUT-OF-TOWN LAWYERS FLOW INTO FLINT, FILING WATER CRISIS LAWSUITS," explained:

> Flint residents continue to deal with unsafe lead levels in their water. Another group is paying very close attention. Lawyers. Lots of lawyers.
>
> Turn the TV on in Flint and you'll likely hear a commercial with a very specific question.
>
> "If you've tested positive for the presence of lead in your blood, experienced nausea, hair loss, skin loss or other issues after consumption of Flint River water or property damage caused by the Flint River water system., you need to call ..." and at that point the announcer gives the name and contact information for a New York law firm.
>
> Attorneys are swarming around Flint – advertising, holding public meetings and even hosting clinics where adults and children can have their blood tested. [(*Id.* ¶ 200.)]

---

[10] *Id.* ¶¶ 2, 10, 34, 55, 86, 93, 104, 107, 113, 165-66, 173, 182-83, 185, 195, 200-01, 203, 221.

22. If such advertisements, public meetings, and legal clinics were not cause enough for concern, many of these plaintiffs lawyers have made direct, prejudicial, and case-specific statements to the media. In a February 2016 *Associated Press* article, Hunter Shkolnik, counsel in the *Waid* case, asked "How can they [(*i.e.*, Defendants)] look at themselves in the mirror?" and stated that "It's an embarrassment for government officials to take the safety of their citizens so lightly." (*Id.* ¶ 183.) Similarly, Marc Bern, counsel in the *Washington* case, opined that the situation in Flint pales in comparison to the health issues first responders suffered following the collapse of the World Trade Center and then commented that "We haven't been attacked by foreign people . . . We've been attacked by those who are here in Michigan." (*Id.* ¶ 93.)

23. Not to be outdone, on September 20, 2016, Michael Pitt, lead counsel for Plaintiffs in this very case, gave a highly inflammatory interview on *Michigan Radio's* show "*Stateside*" where he described Defendants as "criminals" and "racists," expressed shock that Defendants asserted their right to governmental immunity and a state-funded legal defense, and then accused them of conducting an "experiment" with "poisonous" water on the "African American population in Flint." (*See* Pitt Interview Transcript, attached as **Exhibit C**.) With respect to this last incredible accusation, Mr. Pitt stated:

> First, the whole process of running this highly polluted, high corrosive Flint River water through essentially dormant Flint Water Treatment Plant was an experiment. And I say it was an experiment because they didn't know if it was going to actually work.

*   *   *

11

In fact, the two MDEQ employees who said go ahead and start the plant are now being criminally prosecuted for allowing the plant to go forward when it wasn't adequate for the job at hand, and so, people were being poisoned because of a failed experiment . . . moreover, this is a case of environmental racism.

*      *      *

Somebody had to take the brunt of the experiment.  Was it going to be the African American community in Flint or was it going to be the predominantly white community surrounding Flint? And they chose to run the experiment on the African American population in Flint, and there was a tremendous amount of risk that was involved, and they decided to expose the predominantly black community of Flint to the high risk of this experiment. The experiment failed; people got sick; some people died; and here we are a year later with a terrible ordeal for the people of Flint that, that cries out for justice. [(*Id.*)]

24.     **Politicization**: At every level of government, the Flint water crisis has been marked by declarations of emergency, disputes over public aid packages, raucous congressional hearings, fault-allocating investigative commissions, and remarkably uneducated finger-pointing from both sides of the political aisle, including among presidential and gubernatorial contenders, federal and state legislators, and local officials.[11] The lowness of this political discourse has been largely concentrated on the allocation of blame (much of it mistakenly toward the MDEQ Defendants). All of it has been highly publicized by the local media.

25.     Between December 2015 and January 2016, the local, state, and federal governments all declared states of emergency in response to Flint's water supply issues and the National Guard was called in to Flint to assist in distributing water and water filters. President Obama's declaration of federal emergency in Flint was praised in local media accounts by a number of politicians, including

---

[11] *See* Ex. B ¶¶ 39, 110, 122-23, 141, 152, 194, 204-16, 220, 222-25, 228-29.

Congressman Dan Kildee (D-Flint) who said: "The residents and children of Flint deserve every resource available to make sure that they have safe water and are able to recover from this terrible manmade disaster created by the state." (*Id.* ¶ 204.)  Months later, in May of 2016, President Obama gave a speech (heavily covered by local media) to *a crowded auditorium in Flint* where he called on Congress to pass a sizable aid package and characterized the City's water crisis as having resulted from "a corrosive attitude that exists in our politics that exists in too many levels of our government." (*Id.* ¶ 205.)

26.    There have been numerous Congressional hearings concerning the Flint water crisis, including a notable series of hearings before the House Committee on Oversight and Government Reform. These hearings were attended by large groups of Flint residents, were pervaded by a circus-like atmosphere often referred to as a "finger-pointing affair," and were widely and disproportionately reported on throughout Michigan, particularly in the Eastern District. (*Id.* ¶¶ 206-09.) Similarly, public aid packages for Flint have been a heated political issue with Senate Democrats recently threatening a shutdown of the entire federal government over the issue. (*Id.* ¶¶ 210-11.) As both political parties continue to debate this issue, local news outlets closely following the matter have been quick to criticize Congress for failing to pass any legislation providing monetary aid to Flint. (*Id.* ¶ 212.)

27.    The crisis has also been a hot button issue for presidential hopefuls. On March 6, 2016, a well-attended Democratic primary debate was held *in Flint*. Both Hilary Clinton and her then-opponent, Bernie Sanders, were eager to

13

capitalize on the crowd's emotions and the ample Michigan media attention. To rising cheers from the audience, Clinton said "[t]his is an emergency . . . [e]very day that goes by . . . is another lost day in a child's life." She then called for new infrastructure and long-term care for Flint's residents, and indicated that "[i]f Michigan won't do it, there have to be ways that we can move and then make them pay for it and hold them accountable." Sanders, meanwhile, called for Defendant Snyder's resignation before stating that "we are talking about . . . children being poisoned" and stating "[o]ne wonders if this had been a white suburban community what kind of response there might have been." (*Id.* ¶ 214.)

28.     Republicans have not ignored the issue. During a recent visit in Flint, Republican nominee, Donald Trump, promised that Flint's issues would "be fixed quickly and effectively" before stating: "It used to be that cars were made in Flint and you couldn't drink the water in Mexico . . . Now cars are made in Mexico, and you can't drink the water in Flint. That's terrible." (*Id.* ¶ 216.)

29.     Michigan's presumed gubernatorial candidates also have been quick to cast blame and politicize the issue. Republican favorite Bill Schuette, along with special prosecutors, Todd Flood and Noah Hall, have appeared on numerous media outlets and held multiple conferences concerning the crisis, and publically declared that at least five of the MDEQ Defendants are guilty of criminal misconduct, stating that: "*These individuals concealed the truth. They were criminally wrong to do so . . . Their offenses vary, but there is an overall theme and repeated pattern. Each of these individuals attempted to bury, or cover up, to downplay or hide information . . . .*" (*Id.* ¶ 217.)

14

30.    Ingham County Prosecutor, Gretchen Whitmer challenged the strategy of using the press to make the State's criminal case against defendants, because of the potential prejudicial impact of the jury pool. (*Id.* ¶ 246.) Although she is not the official leading the State's criminal investigation, even Prosecutor Whitmer has made her fair share of prejudicial comments regarding the crisis. Late last year, for example, she appeared on in *WKAR's* show "*Off the Record*" where she opined that the Flint water "crisis" was caused by the "callous disregard" of public officials and warned citizens to question whether the government is really protecting them.

31.    Others have chimed in as well, utilizing the ever eager local media to politically capitalize on Flint's situation. Congressman Dan Kildee (D-Flint) has "put the blame squarely on the feet of Republican Gov. Rick Snyder and his administration." (*Id.* ¶ 220.) State Senator Jim Ananich (D-Flint) has been outspoken and critical of the MDEQ Defendants, in particular, saying "MDEQ mistakes had a devastating effect on [Flint]," (*id.* ¶ 221); that MDEQ's culture under Snyder led to the crisis, (*id.* ¶ 222); and that MDEQ was giving "false statements" to EPA, (*id.* ¶ 223). Lieutenant Governor Brian Calley has blamed MDEQ's culture as one of "compliance" but not "safety," ignoring the long-settled law that administrative agencies are creatures of statute invested with only those powers granted by the legislature. (*Id.* ¶ 172.) Meanwhile, former Congresswoman Candice Miller (R-Macomb) has called the crisis "an epic failure of government at every level." (*Id.* ¶ 224.)

15

32.    **Empirical Content Analysis**: If there was any doubt, empirical data collected by Dr. Edelman this past summer confirms that the Court's jury pool has been "saturated with highly prejudicial and sensational news coverage surrounding what is often described by the media as the 'water crisis' in Flint, the 'lead-poisoning' of children there, and the 'failure' of government officials to protect or disclose the risk to the public." (*See* Edelman Declaration (Ex. A) ¶ 3.)

33.    His media analysis of the *Detroit Free Press*, alone, identified 718 articles between April 25, 2014 and June 6, 2016. In these articles, the *Detroit Free Press* described the matter at issue here as a "crisis" 1,695 times and a "water crisis" 885 times. (*Id.* ¶¶ 31, 36.) There were 319 references to "lead poisoning." (*Id.* ¶ 37.) The quality of Flint drinking water was described as "foul" 36 times, "brown" 32 times, "discolored" 58 times, "smelly" 81 times, "toxic" 95 times, and "dangerous" 70 times. (*Id.*) References to "children" were made over 1,000 times. And, there were 372 mentions of "elevated blood levels," 54 mentions of "brain damage," 116 mentions of irreversible "behavioral problems," and 164 mentions of "rashes." (*Id.* ¶ 38.)

34.    Dr. Edelman found that many of the articles he reviewed stated that "government officials knew about problems with the drinking water, failed to take basic protective measures, and then covered-up what they knew." (*Id.* ¶ 39.) Specifically, he found that there "were 18 mentions of 'red flags,' 55 to 'ignored,' 46 to 'alarm' . . . and hundreds more to government emails which showed growing concerns behind closed doors." (*Id.*) As limited examples, Dr. Edelman cited to an article stating that "Flint residents complained to indifferent state officials for

nearly a year before whistle-blowers proved that children were being poisoned"
and identified that there were at least 40 articles stating that General Motors
stopped using Flint water because it was corrosive. (*Id.* ¶ 37, 39-40.)

35.     Based on this "limited content analysis," Dr. Edelman concluded that
"the nature of coverage surrounding this case incorporates the types of sensational
and prejudicial reporting that can captivate the public's attention, generate anger,
and lead to widespread bias in the jury pool."  (*Id.* ¶ 41.)

## QUANTITY OF ADVERSE PUBLICITY

36.     A Westlaw "News" search of the principal newspapers in the Eastern
District of Michigan (*i.e., Detroit Free Press, Detroit News*, and *Flint Journal*) for
articles pertaining to the "Flint water crisis" produced an astounding number of
results. A search of the terms "Flint 5 water" for the period from April 24, 2014,
the day before Flint began using the Flint River as its water source, through
September 26, 2016, produced the following results: (a) *Detroit Free Press*: 1,786
articles, (**Exhibit D** ); (b) *Flint Journal*: 1,368 articles, (**Exhibit E** ); and (c)
*Detroit News*: 567 articles, (**Exhibit F**).

37.     Dr. Edelman's media analysis of the 718 articles published by the
*Detroit Free Press* between April 25, 2014 and June 6, 2016, also confirms that
this case has "generated massive and pervasive coverage, which has actually
increased with the passage of time." (*See* Edelman Declaration (Ex. A) ¶ 31.)[12]
According to Dr. Edelman, media coverage from just the *Detroit Free Press* is

---

[12] An archive of the 718 *Detroit Free Press* articles is attached as **Exhibit G**.

17

**over eight times** higher than the median number of news articles (*i.e.,* 88.5) present in 52 cases studied by Dr. Edward Bronson, a respected jury expert and scholar, where a change of venue was granted. (*Id.* ¶ 33.). Accordingly, the 3,721 articles identified in the Westlaw search represent approximately **forty-two times** more articles than the median of prejudicial articles reported in 52 cases where a change of venue was granted. (*Id.*)[13]

38.   In contrast, the media's reports in the Western District of Michigan have been less voluminous. The Westlaw search of the *Kalamazoo Gazette* from April 24, 2014 to September 26, 2016, produced 204 articles. (**Exhibit H**.) A search of the *Traverse City Record Eagle* produced 81 results for the same time period. (**Exhibit I**.) Westlaw does not have access to the *Grand Rapids Press*. However, counsel's search of the *Grand Rapids Press* archives using a similar search phrase ("Flint adj5 water") showed that the *Grand Rapids Press*, the leading newspaper on the west side of the State, published 267 articles about the Flint water matters from January 29, 2015 to September 26, 2016. (**Exhibit J**.) These three newspapers, located in the southern, middle, and northern parts of the Western District, collectively published 552 articles pertaining to the "Flint water crisis." This is approximately *12% of the number of articles published in the Eastern District.* The volume and frequency of newspaper articles in the Eastern District vastly exceed those published in the Western District.

---

[13] These figures do not incorporate articles from the other newspapers with significant circulation in the Eastern District. Nor do they take into account the massive amount of radio, online and social media, and television coverage circulated in this District. (*Id.* ¶ 32).

18

39.     The media coverage of the Flint water "crisis" shows no signs of waning. In fact, all signs indicate that the local media's continued thirst to provide news of the "crisis" will only intensify as the criminal and civil cases inch toward what will surely be portrayed as a salacious trial. (*See* Edelman Declaration (Ex. A) ¶¶ 31, 34, 112.)

### COMMUNITY REACTION TO ADVERSE PUBLICITY

40.     According to Defendant Snyder's Flint water website, over 32,400,000 liters of bottled water, 130,000 filters, and 290,000 cartridges have been distributed to the residents of Flint. The State of Michigan, as of August 2016, has appropriated over $200,000,000 to address safe drinking water, food and nutrition, social development, physical well-being, and water-bill issues in Flint. The federal government, likewise, has made available a tremendous amount of resources and services to the people of Flint, including $20,000,000 in road repair funds, and is in the process of appropriating additional funds.

41.     Countless private philanthropic organizations across the State have raised a tremendous amount of support for Flint residents. To name just a few examples, the Charles Stewart Mott Foundation reports that a collaboration of 10 foundations will work together to help the city of Flint recover from its water crisis and have committed a total of nearly $125,000,000 in funding, (*id.* ¶ 226); "Save the Children" says that it has helped over 11,000 Flint families by providing nutrient-rich food and early childhood development support, (*id.* ¶ 227); and the University of Michigan's Water Crisis: Community Impact Fund is, among other

19

activities, analyzing Flint's water infrastructure and providing free lead screening.[14]

42.     Celebrities from near and far have raised awareness and financial support. Detroit Pistons owner Tom Gores pledged $10 million to Flint, Beyonce announced plans for a Flint fund, and famous comedians have hosted shows in Michigan to benefit the "Flint Child Health and Development Fund" (Ex. B ¶ 228.) Other stars like Cher, Eminem, Mark Wahlberg, Big Sean, Pearl Jam, Jimmy Fallon, Matt Damon, Jack White, Mark Ruffalo, and Michael Moore, Sandra Bernhard, Magic Johnson, Madonna, Snoop Dog, Puff Daddy, Rosie O'Donnell, and Seth Meyers have raised money and awareness for Flint. (*Id.* ¶¶ 229-30.)

43.     Moreover, the *Detroit Free Press* has run countless stories like "STARS USE SOCIAL MEDIA TO EXPRESS OUTRAGE OVER FLINT," "FLINT CRISIS ATTRACTS CELEBRITY CASH - AND SCAMMERS," "TOP DIRECTORS, PERFORMERS TO BE IN FLINT ON OSCAR NIGHT," and "DON'T FORGET ABOUT FLINT NOW THAT CELEBRITIES AND TV CAMERAS ARE GONE," to encourage continued support for Flint and its residents. (*Id.* ¶¶ 229, 231-33.)

44.     When polled, as part of Dr. Edelman's survey, over half of this Court's jury pool states that they have donated money or resources to help the people in Flint who have been affected by the water "crisis." (*See* Edelman Declaration (Ex. A) ¶ 4, 45.) Specifically, Dr. Edelman identified that **55%** of

---

[14] https://www.umflint.edu/outreach/community-impact-fund

respondents reported that they or family members have donated money or resources, compared to **53%** in the Grand Rapids jury pool and **20%** in the Marquette jury pool. (*Id.* ¶ 105.) These community outreach figures are significant where **90%** of survey respondents who have donated resources favored the plaintiffs in these lawsuits and were more likely to award damages to punish Defendants. (*Id.*) Notably, "those who read the Detroit News, Detroit Free Press, and the Oakland Press were significantly more likely to donate resources than those who read other newspapers." (*Id.* ¶ 106.)

45.     Defendants (including the MDEQ Defendants) have also been the subject of numerous instances of community hostility. In Ann Arbor streets have been littered with chalk graffiti expressing negative comments toward public officials, the Governor has been heckled at Ann Arbor establishments, and there have been several protests conducted outside of the Governor's Main Street condo. (*See* Ex. B ¶¶ 234-36.) Indeed, just blocks away from this Court, perhaps near venues where the Court's jurors eat lunch, one can even find "wanted" posters seeking the arrest of Defendant Snyder.

46.     In Flint, such acts of community outrage over the water are common place. Protests have been attended by crowds sometimes in the thousands hoisting jugs of discolored water of unconfirmed origin and displaying inflammatory signs calling for resignations, arrests, and justice; accusing Defendants of poisoning children; and referencing "murderers," "lab rats," "dead children," and "lead-tainted water." (*Id.* ¶¶ 158-59, 237-38.)

47.     Earlier this year, Defendant Snyder was loudly booed and heckled in Flint when he spoke to about 1,000 students, teachers, and residents at Northwestern High School. (*Id.* ¶ 239.) His family has been threatened. (*Id.* ¶ 240.) And, over 620,000 persons have signed a petition calling for him to be arrested. (*Id.* ¶ 241.) It is beyond debate that a mob mentality has formed.

48.     Such community-wide hostility, however, has not been focused solely on Defendant Snyder. Much of the outrage has been directed at the MDEQ Defendants, all of whom have been the recipient of a number of wrongly-aimed personal attacks readily available for viewing by the jury pool. By way of limited example, online comments following local articles on the Flint water crisis include:

- Maybe it will be better to wait for the Feds to charge these criminals and let them rot in a country club prison, but as long as they rot in prison is the justice deserved. (*Id.* ¶ 189.)

- The people doing the tests and releasing results are the ones to blame here, so yea, that makes sense. (*Id.* ¶ 191.)

- I don't think this was about money. This is about lazy government employees not doing their jobs. (*Id.*)

- The DEQ and governor knew of the corrosion problems when GM presented the analysis of the water corroding its engine parts in October of 2014! (*Id.*)

- Stephen Busch currently on "suspension" ought to be under arrest. Mike Prysby—they are coming for you. Liane Shekter Smith, getting fired is the least of your problems . . . Their collective lack of curiosity, dereliction and stonewalling will doom them and many others who were involved in this outrageous tragedy. (*Id.* ¶ 192.)

- Busch should be criminally charged. This was his reaction when annoyed [by] the efforts of Miguel Del Toral . . . "if he continues to persist, we may need Liane (Shekter Smith) or Director (Dan) Wyant to make a call to EPA to help address his overreaches." (*Id.*)

- I think jail time is necessary for some of these folks. (*Id.*)

- The state should be forced to disband the entire DEQ Dept. They have proven to be worthless, and LIARS. Get rid of all of them. Talk about a waste of tax money!! (*Id.*)

- I agree, but the State DEQ was not only incompetent, they tried to hide dangerous lead levels communicated by the EPA and upper level EPA folks gave them their blessing in their obfuscation. (*Id.*)

- Michael Prysby and Stephen Busch NEED TO BE FIRED!!! I have been saying this for 18 months! Jim Sygo should be added to the list after this article! All this proves is their clear lack of human decency from the outcry of people in writing! Citizens need to demand termination! It makes me ill to know my tax paying dollars go to these very people who poisoned my family and every other person in Flint. (*Id.* ¶ 187.)

- No Brad Wurfel, you and your colleagues lost the human element. You all are now going to have to live with the death, long-term suffering, and financial catastrophe which your arrogance, contempt, corruption, greed, ignorance, incompetence, and willful neglect has caused and inflicted on the very Taxpayers Citizens who paid your salary . . . For the rest of your lives . . . . (*Id.* ¶ 242.)

## EMPIRICAL EVIDENCE OF JUROR PREJUDICE

49. **Eastern District – Ann Arbor:** The public opinion survey conducted by Dr. Edelman in the Eastern District's Ann Arbor Place of Holding Court showed significant recognition of both the Flint water crisis, and some of the more prejudicial publicity surrounding it. (*See* Edelman Declaration (Ex. A) ¶¶ 42-47.) For example, this past summer, recognition of the Flint water crisis was **95%**, with **71%** of potential jurors aware of the civil lawsuits and **65%** aware of the criminal charges. (*Id.* ¶¶ 47, 100.) Of the seven news items included in the survey, the median number recognized among respondents from this Court's jury pool was **five**. (*Id.* ¶ 60.) Moreover, **40%** of respondents recognized all three of the

23

following prejudicial media items: criminal charges, child lead exposure, and misapplication of federal drinking water rules. (*Id.* ¶ 100.) Dr. Edelman opined that these recognition rates "are some of the highest [he has] seen." (*Id.* ¶ 47.)

50.    Among respondents familiar with the civil lawsuits, **83%** believed that "city and state public officials acted with reckless disregard for the public's safety by exposing them to high levels of lead in the drinking water." (*Id.* ¶ 48.) Among respondents unfamiliar with the civil lawsuits, those favoring the plaintiffs stayed level at **83%.** (*Id.* ¶ 49.)[15] Of respondents who were familiar with either the water crisis or lawsuits, **74%** believed that, "damages should be awarded in order to punish the city and state officials who are the defendants in these lawsuits." (*Id.* ¶ 56.) A large percentage (**55%**) of respondents reported that they or family members have donated money or resources to help Flint. (*Id.* ¶ 105.)

51.    According to Dr. Edelman, "[t]hese findings are extremely alarming and show that the burden of proof at the start of trial would be unfairly shifted to the defendants, who would have to prove that they were not grossly negligent." (*Id.* ¶ 53.) In fact, he believes that the prejudice here "has reached levels so severe that it rivals some of the most notorious cases in American history, including what was seen in the Oklahoma City Bombing trials." (*Id.* ¶ 3.)

---

[15] Among this group, **93%** reported that defendants would have a difficult time convincing them that they did not act with reckless disregard for the public's safety. (*Id.* ¶ 53.)

24

52.     Dr. Edelman further found that the "qualitative" comments from this
Court's jury pool "demonstrated widespread negative opinions unlikely to be
ameliorated through judicial admonition":

- "The evidence that we have seen is that they knew all about it and
  ignored it for a long time."

- "I think the evidence that I have heard proves there was knowledge of a
  problem and officials did not act upon it."

- "Because I think from what I read that they did act with reckless
  disregard. I think it was more profit driven."

- "I think it was for financial reasons they didn't want to spend the money
  to fix the problem so they covered it up.  It would have stayed covered up
  if the pediatrician didn't blow the whistle on the whole scandal."

- "They misled the people and lied to them. They were untruthful and the
  state knew that the water was bad. The people that worked for the state of
  Michigan drank bottled water.  Not telling them the water was messed
  up. So, they knew about it beforehand."

- "They knew prior to that the water was unsafe. General Motors had
  hooked up to the Flint River and the water rusted their cars. That's how
  they should have known."

- "Because it has been proven they lied and misled. Governor Snyder came
  out and said it."

- "Because they poisoned people and children. There's no grey area here."
  (*Id.* ¶ 54.)

53.     Based on these survey results, Dr. Edelman opined that in his
experience "[c]ase-specific attitudes such as these cannot just be simply cast aside
with a judicial instruction, and are likely to put an undue burden on the defense
that is almost impossible to overcome." (*Id.* ¶ 56.)

54.     He further averred that: "[t]aken as a whole, the extensive and deep seeded prejudice found in the Ann Arbor jury pool represents the highest levels I have seen . . . ." (*Id.* ¶ 46.)

55.     For those and other reasons stated in his declaration, Dr. Edelman recommends that "it is within the interest of justice to transfer these cases outside of the Eastern District to a venue in a different media market." (*Id.* ¶ 91.)

56.     **Western District – Southern Division:** The public opinion survey conducted by Dr. Edelman in the Southern Division of the Western District showed significant recognition of the Flint water crisis, but less recognition of some of the more prejudicial publicity surrounding it. (*Id.* ¶ 6.) For example, recognition of the Flint water crisis was **99%**, with **63%** of potential jurors aware of the civil lawsuits and **56%** aware of the criminal charges. (*Id.* ¶ 93, 100.) Of the seven news items included in the survey, the median number recognized among respondents in the Southern Division was **four**. (*Id.* ¶ 99.) Similarly, **24%** of respondents recognized all three of the following prejudicial media items: criminal charges, child lead exposure, and misapplication of federal drinking water rules. (*Id.* ¶ 100.)

57.     Among respondents familiar with the civil litigation, **81%** believed that Defendants acted with reckless disregard. (*Id.* ¶ 94.) Among respondents unfamiliar with the civil lawsuits, those favoring the plaintiffs inched up to **82%.** (*Id.* ¶ 95.) A large percentage (**53%**) of respondents reported that they or family members have donated money or resources to help Flint. (*Id.* ¶ 105.)

26

58.    Based on these responses, Dr. Edelman opined that there is a disturbing level of prejudice in the Western District's Southern Division, and that this case should be transferred to a venue outside of Michigan. (*Id.* ¶ 109.)

59.    **Western District – Northern Division:** The public opinion survey conducted by Dr. Edelman in the Northern Division of the Western District also showed significant recognition of the Flint water crisis, but less recognition of some of the more prejudicial publicity surrounding it than in the other Michigan Districts. (*Id.* ¶ 6.) For example, recognition of the Flint water crisis was **96%**, but only **56%** of potential jurors were aware of the civil lawsuits and only **44%** were aware of the criminal charges. (*Id.* ¶¶ 93, 100.) Of the seven news items included in the survey, the median number recognized among respondents in the Northern Division was **three**. (*Id.* ¶ 99.) Similarly, only **18%** of respondents recognized all three of the following prejudicial media items: criminal charges, child lead exposure, and misapplication of federal drinking water rules. (*Id.* ¶ 100.)

60.    Among respondents familiar with the civil litigation, **89%** believed that Defendants acted with reckless disregard. (*Id.* ¶ 94.) But among respondents unfamiliar with the civil lawsuits, those favoring the plaintiffs dropped to **74%**. (*Id.* ¶ 94.) Only **20%** of respondents reported that they or family members have donated money or resources to help Flint. (*Id.* ¶ 105.) And, only **10%** of respondents felt that they had been impacted personally or knew someone who had been impacted personally by the Flint water crisis. (*Id.* ¶ 104.)

61.    Based on these responses, Dr. Edelman opined that there is a concerning level of prejudice in the Western District's Northern Division, and that

27

this case should be transferred to a venue outside of Michigan. (*Id.* ¶ 109.) However, because the jury pool in the Northern Division "is less knowledgeable about prejudicial media reporting surrounding events in Flint, and less engaged in helping the residents there," Dr. Edelman opined that the Northern Division "represents the least prejudicial option available" in Michigan. (*Id.* ¶¶ 6, 109.)

## CONCLUSION

62.    This saturation of adverse publicity and extreme community outrage has resulted in the omnipresent view among this Court's jury pool that Defendants (particularly the MDEQ Defendants) caused and are liable for the Flint water crisis. This proverbial bell cannot be un-rung. It is axiomatic that such extreme levels of bias render the *voir dire* process ineffective. (*Id.* ¶¶ 66-91.) In fact, the sheer amount of adverse publicity and documented juror prejudice here exceeds that found in numerous other federal cases where venue was transferred to protect a defendant's constitutional right to a fair trial and impartial jury.

63.    The MDEQ Defendants thus urge the Court to transfer this case to an out-of-state, metropolitan venue offering a jury pool substantially more likely to render an unbiased decision based on admissible evidence procured at trial rather than on their ties to the affected community, or on what they have already read, seen, or heard in local media accounts.

64.    Alternatively, the MDEQ Defendants ask the Court to transfer this matter to the least prejudicial venue in this State; the Northern Division of the United States District Court for the Western District of Michigan. Two related cases are already pending in the Southern Division of the Western District. *See*

28

*Nappier v. Snyder*, Case No. 1:16-cv-00636 (W.D. Mich.); *Anderson v. Snyder*, Case No. 1:16-cv-00874 (W.D. Mich.).

65.    Pursuant to E.D. Mich. L.R. 7.1(a), counsel for the MDEQ Defendants explained the nature of this motion to change venue, its legal basis, and requested, but did not obtain, concurrence from Plaintiffs' counsel via e-mail on October 17, 2016. The remaining Defendants have been consulted but have not yet taken a position on this Motion for Change of Venue.

66.    In support of this motion, the MDEQ Defendants rely on their contemporaneously filed Brief in Support of Motion for Change of Venue and the Exhibits attached thereto, including the Declaration of Dr. Bryan Edelman.

WHEREFORE, MDEQ Defendants respectfully request that this Honorable Court: (a) grant their Motion to Change Venue; (b) transfer this case to either an out-of-state venue where they are more likely to receive a fair trial or, alternatively, to the Northern Division of the United States District Court for the Western District of Michigan; and (c) award them any different or further relief this Court deems equitable and just.

Dated:  October 21, 2016

Respectfully submitted,

Foster, Swift, Collins & Smith, P.C.
Attorneys for Defendants Patrick
Cook, Michael Prysby, and Adam
Rosenthal

Fraser, Trebilcock, Davis & Dunlap
Attorneys for Defendant Liane
Shekter Smith

By:  */s/ Charles E. Barbieri*
     (with permission)
     Charles E. Barbieri (P31793)
     313 S. Washington Sq.
     Lansing, MI 48933
     (517) 371-8100
     cbarbieri@fosterswift.com

By:  */s/ Thaddeus E. Morgan*
     (with permission)
     Thaddeus E. Morgan (P47394)
     124 W. Allegan St., Ste. 1000
     Lansing, MI 48933
     (517) 482-5800
     tmorgan@fraserlawfirm.com

Clark Hill PLC
Attorneys for Defendants Daniel
Wyant and Bradley Wurfel

Kotz Sangster Wysocki, P.C.
Attorneys for Defendant Stephen Busch

By:  */s/ Michael J. Pattwell*
     Michael J. Pattwell (P72419)
     212 E. Grand River Ave.
     Lansing, MI 48906
     (517) 318-3043
     mpattwell@clarkhill.com

By:  */s/ Philip A. Grashoff, Jr.*
     (with permission)
     Philip A. Grashoff, Jr. (P14279)
     36700 Woodward Ave., Ste. 202
     Bloomfield Hills, MI 48304
     (248) 646-1050
     pgrashoff@kotzsangster.com

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MELISSA MAYS, et al.,

              Plaintiffs,                      Case No. 5:15-cv-14002-JCO-MKM

v.                                   Judge John Corbett O'Meara

RICK SNYDER, et al.,               Mag. Judge Mona K. Majzoub

              Defendants.                 CLASS ACTION

_____/

**BRIEF IN SUPPORT OF MDEQ DEFENDANTS'
MOTION FOR CHANGE OF VENUE**

i

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................1

II. ARGUMENT .......................................................................5

A. A Change of Venue is Necessary to Protect Defendants'
   Constitutional Right to a Fair Trial by an Impartial Jury ....................5

   1. The United States Constitution Guarantees Civil
      Defendants a Fair Trial by an Impartial Jury ............................5

   2. Federal Courts Must Safeguard Defendants' Right to a
      Fair Trial by an Impartial Jury .......................................6

   3. The Adverse Publicity Pervading the State
      Jeopardizes Defendants' Right to a Fair Trial by an
      Impartial Jury.........................................................8

      a. The Media Analyses and Public Opinion
         Surveys Show that a Change of Venue is
         Needed............................................................8

      b. Local Media's Repeated Portrayal of
         Defendants' Statements as "Admissions" of
         Liability Requires a Change of Venue .........................11

      c. The Politicization of This Matter Requires a
         Change of Venue .............................................13

      d. The Local Community's Emotional Reaction
         Requires a Change of Venue.......................................14

   4. Juror Prejudice Across Michigan is so Pervasive and
      Entrenched that Transfer to an Out-Of-State Venue is
      Required ..............................................................16

   5. The Court Should Not Defer Transfer of Venue.....................19

B. Alternatively, Transfer to the Northern Division of the
   Western District is Appropriate under 28 U.S.C. 1404(a) ................20

III. CONCLUSION ...................................................................24

ii

## STATEMENT OF QUESTIONS PRESENTED

I.  Whether this matter should be transferred to an out-of-state venue in order to protect the MDEQ Defendant's constitutional right to fair trial by an impartial jury, where highly inflammatory adverse publicity has saturated the State of Michigan and where 83% of this Judicial District's jury pool freely admits to being prejudiced against the MDEQ Defendants?

MDEQ Defendants answer:          "Yes"

Plaintiffs answer:                    "No"

II.  Alternatively, whether it is within the interest of justice for the Court to transfer this matter to the Northern Division of the United States District Court for the Western District of Michigan because that venue is the least prejudicial venue in the State of Michigan?

MDEQ Defendants answer:          "Yes"

Plaintiffs answer:                    "No"

## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

### United States Supreme Court Cases

*Irvin v. Dowd*, 366 U.S. 717 (1961) (presumed prejudice based on *voir dire* results required reversal of conviction and change of venue)

*Rideau v. Louisiana*, 373 U.S. 723 (1963) (presumed prejudice based on brief publication of admission of guilt required reversal of conviction and change of venue)

*Marshall v. United States*, 360 U.S. 310 (1959) (broad supervisory authority of federal courts to transfer venue)

### United States Court of Appeals Cases

*Moses v. Bus. Card Exp., Inc*., 929 F.2d 1131 (6th Cir. 1991) (systematic integrity and fairness come within interest of justice factor)

*McCoy v. Goldston*, 652 F.2d 654 (6th Cir. 1981) (constitutional right to fair trial by impartial jury in civil cases)

*Goins v. McKeen*, 605 F.2d 947 (6th Cir. 1979) (juror assurances of impartiality insufficient when exposed to significant adverse publicity)

*Wash. Pub. Utilities Group. v. U.S. Dist. Court for W. Dist. of Wash*., 843 F.2d 319 (9th Cir. 1987) (transfer of venue within interest of justice based on adverse publicity)

*Skaggs v. Otis Elevator Co*., 164 F.3d 511 (10th Cir. 1998) (civil defendants are constitutionally entitled to a fair trial by an impartial jury)

*Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985) (presumed prejudice based on community hostility required change of venue)

iv

**United States District Court Cases**

*United States v. Sablan*, 2014 U.S. Dist. LEXIS 175682 (E.D. Cal. Dec. 19, 2014) (unpublished) (presumed prejudice based on public opinion survey required change of venue)

*United States v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996) (presumed prejudice based on adverse publicity and community bias necessitates out-of-state transfer)

*United States v. Tokars*, 839 F. Supp. 1578 (N.D. Ga. 1993) (same)

*United States v. Moody*, 762 F. Supp. 1485 (N.D. Ga. 1991) (same)

*United States v. Ebens,* 654 F. Supp. 144 (E.D. Mich. 1987) (same)

*United States v. Marcello*, 280 F. Supp. 510 (E.D. La. 1968) (same)

*Haase v. Gilboy*, 246 F. Supp. 594 (E.D. Wis. 1965) (transfer of venue based on interest of justice)

**State Cases**

*Powell v. Superior Court*, 232 Cal. App. 3d 785 (1991) (presumed prejudice based on politicization of subject matter of litigation)

## Constitution

U.S. Const. amend. V

U.S. Const. amend. VI

U.S. Const. amend. VII

## Statutes

28 U.S.C. § 1404(a)

# INDEX OF AUTHORITIES

**Cases**

*Amphion, Inc. v. Buckeye Elec. Co.*,
285 F. Supp. 2d 943 (E.D. Mich. 2003) .............................................................. 21

*Anderson v. Snyder*,
Case No. 1:16-cv-00874 (W.D. Mich.) ............................................................29, 4

*Bankers Trust Co. v. Crawford*,
559 F. Supp. 1359 (W.D.N.Y. 1983).................................................................. 21

*Barnes v. Century Aluminum Co.*,
2013 U.S. Dist. LEXIS 66054 (D.V.I. May 9, 2013)............................................ 5

*Bellomo v. United States*,
297 F. Supp. 2d 494 (E.D.N.Y. 2003) ................................................................ 21

*Brown v. New York*,
947 F.Supp.2d 317 (E.D.N.Y. 2013)................................................................... 23

*Bruton v. United States*,
391 U.S. 123; 88 S. Ct. 1620 (1968) .................................................................. 12

*Caldwell v. State*,
164 Tenn. 325 (1932)......................................................................................... 13

*Coleman v. Kemp*,
778 F.2D 1487 (11th Cir. 1985).................................................................vi, 14, 16

*Commonwealth v. Cohen*,
489 Pa. 167 (1980).............................................................................................. 9

*Dakota Hotel Ventures, LLC v. David Baumann-Architect, Ltd.*,
2016 U.S. Dist. LEXIS 26497 (D.S.D. Mar. 2, 2016) ......................................... 25

*Daniels v. Woodford*,
428 F.3d 1181 (9th Cir. 2005)..................................................................10, 14, 16

*Delaney v. United States*,
199 F.2d 107 (1st Cir. 1952) ................................................................. 19

*DeLisle v. Rivers*,
161 F.3d 370 (6th Cir. 1998).................................................................. 7

*Fein v. Pub. Serv. Coordinated Transp.*,
165 F. Supp. 370 (E.D. Pa. 1958)......................................................... 21

*Foley v. Parker*,
488 F.3d 377 (6th Cir. 2007).................................................................. 6

*Goins v. McKeen*,
605 F.2d 947 (6th Cir. 1979)..........................................................vi, 19

*Haase v. Gilboy*,
246 F. Supp. 594 (E.D. Wis. 1965) ...................................................... 22

*Haley v. Blue Ridge Transfer Co.*,
802 F.2d 1532 (4th Cir. 1986)................................................................ 5

*Hanning v. New England Mut. Life Ins. Co.*,
710 F. Supp. 213 (S.D. Ohio 1989)...................................................... 21

*Hoffman v. Fairfax Cnty. Redev. & Hous. Auth.*,
276 F. Supp. 2d 14 (D.D.C. 2003) ....................................................... 23

*In re Tsarnaev*,
780 F.3d 14 (1st Cir. 2015) ................................................................... 20

*Irvin v. Dowd*,
366 U.S. 717 (1961).................................................................x, 11, 19

*Jacobs v. Commonwealth*,
870 S.W.2d 412 (Ky. 1994) .................................................................. 15

*Janssen Pharmaceutica, Inc. v. Bailey*,
878 So. 2d 31 (Miss. 2004) .................................................................. 22

vii

*Johnson v. Beto*,
337 F. Supp. 1371 (S.D. Tex. 1972) ..................................................... 15

*Kepler v. ITT Sheraton Corp.*,
860 F. Supp. 393 (E.D. Mich. 1994) .................................................... 21

*Maine v. Superior Court*,
68 Cal. 2d 375 (1968) ....................................................................... 13

*Marshall v. United States*,
360 U.S. 310; 79 S. Ct. 1171 (1959) ............................................... vi, 7

*McCoy v. Goldston*,
652 F.2d 654 (6th Cir. 1981) .......................................................... vi, 6

*Moses v. Bus. Card Exp., Inc.*,
929 F.2d 113 (6th Cir. 1991) .......................................................... iv, 21

*Murphy v. Florida*,
421 U.S. 794; 95 S. Ct. 2031 (1975) ............................................. passim

*N. Ind. Pub. Serv. Co. v. Envirotech Corp.*,
566 F. Supp. 362 (N.D. Ind. 1983) ...................................................... 8

*Nappier v. Snyder*,
Case No. 1:16-cv-00636 (W.D. Mich.) ........................................... 29, 4

*Nebraska Press Ass'n v. Stuart*,
423 U.S. 1327; 96 S. Ct. 251 (1975) .................................................. 12

*New York v. General Motors Corp.*,
357 F. Supp. 327 (S.D.N.Y. 1973) ..................................................... 22

*Oliver v. State*,
250 So. 2d 888 (Fla. 1971) ................................................................ 11

*Pamplin v. Mason*,
364 F.2d 1 (5th Cir. 1966) ................................................................. 15

*Patton v. Yount*,
467 U.S. 1025; 104 S. Ct. 2885 (1984) .................................................................. 7

*People v. Boss*,
261 A.D.2d 1 (N.Y. App. Div. 1st Dep't 1999) ...............................................passim

*Pope v. State,*
126 Tex. Crim. 35 (1934)........................................................................................ 13

*Powell v. Superior Court,*
232 Cal. App. 3d 785 (1991).................................................................................. vii

*Regents of the Univ. of Cal. v. Eli Lilly & Co.*,
119 F.3d 1559 (Fed. Cir. 1997)............................................................................... 21

*Rideau v. Louisiana*,
373 U.S. 723; 83 S. Ct. 1417 (1963) ....................................................................... 7

*Ritchie v. Rogers*,
313 F.3d 948 (6th Cir. 2002).................................................................................... 6

*Sheppard v. Maxwell*,
384 U.S. 333; 86 S. Ct. 1507 (1966) .................................................................6, 13

*Skaggs v. Otis Elevator Co.*,
164 F.3d 511 (10th Cir. 1998)............................................................................ vi, 6

*Skilling v. United States*,
561 U.S. 358; 130 S. Ct. 2896 (2010) ..................................................................... 7

*Smith v. Superior Court,*
276 Cal. App. 2d 145 (1969).................................................................................. 13

*State v. James,*
767 P.2d 549 (Utah 1989)....................................................................................... 15

*State v. Thompson*,
266 Minn. 385 (1963) ............................................................................................. 12

*United States v. Abrahams*,
453 F. Supp. 749 (D. Mass. 1978) .......................................................... 17

*United States v. Angiulo*,
897 F.2d 1169 (1st Cir. 1990) ............................................................... 19

*United States v. Ebens,*
654 F. Supp. 144 (E.D. Mich. 1987) ......................................... vii, 15-16

*United States v. Engleman*,
489 F. Supp. 48 (E.D. Mo. 1980) .......................................................... 20

*United States v. Gordon*,
380 F. Supp. 2d 356 (D. Del. 2005) ....................................................... 8

*United States v. Lawson*,
2009 U.S. Dist. LEXIS 16032 (E.D. Ky. Mar. 2, 2009) ...................................20, 25

*United States v. Maad,*
75 Fed. Appx. 599 (9th Cir. 2003) ...................................................15, 25

*United States v. Marcello*,
280 F. Supp. 510 (E.D. La. 1968) ......................................................... 17

*United States v. Mazzei*,
400 F. Supp. 17 (W.D. Pa. 1975) .......................................................... 17

*United States v. McVeigh*,
918 F. Supp. 1467 (W.D. Okla. 1996) .............................................. 17-18

*United States v. Moody*,
762 F. Supp. 1485 (N.D. Ga. 1991) .................................................. vii, 12

*United States v. Sablan*,
2014 U.S. Dist. LEXIS 175682 (E.D. Cal. Dec. 19, 2014) ...........................passim

*United States v. Tokars*,
839 F. Supp. 1578 (N.D. Ga. 1993) ..................................................passim

*United States v. Williams,*
568 F.2d 464 (5th Cir. 1978)................................................................... 7

*Victaulic Co. v. E. Indus. Supplies, Inc.,*
2013 U.S. Dist. LEXIS 172021 (D.S.C. Dec. 6, 2013)...................................21, 25

*Washington Pub. Utilities Group. v. U.S. Dist. Court for W. Dist. of Wash,*
843 F.2d 319 (9th Cir. 1987)................................................................ 22

*West Am. Ins. Co. v. Potts,*
1990 U.S. App. LEXIS 12513 (6th Cir. July 25, 1990) ...................................21, 25

*Williams v. Superior Court,*
34 Cal. 3d 584 (1983) ...................................................................8, 11

**Constitution**

U.S. Const. amend. V ................................................................. 5-7, 21

U.S. Const. amend. VI  ...............................................................5, 7, 21

U.S. Const. amend. VII................................................................ 1, 5-6

**Statutes**

28 U.S.C. § 1404............................................................................20, 28

xi

## I.   INTRODUCTION

> *How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.*[16]

The overwhelming *quantity* and unique *quality* of the adverse publicity pervading this matter has made it nearly impossible for the Defendants, especially those currently or formerly employed by the Michigan Department of Environmental Quality ("MDEQ Defendants"), to receive a fair trial by an impartial jury in this Judicial District and potentially the State of Michigan. Local media's constant and unyielding reporting of the Flint water "crisis" has been prolific, incendiary, fraught with inaccuracies, and heavily slanted against the MDEQ Defendants. Over the last year, few days have gone by without this Court's jury pool hearing that the residents of Flint and their children were "poisoned" with "lead" and "bacteria" tainted water due to the MDEQ Defendants' *alleged* "incompetence," "arrogance," "callous disregard," "criminal misconduct," and even "racism."[17]

To potential jurors, the constant influx and repetition of local media stories painting Defendants (particularly the MDEQ Defendants) as indifferent

---

[16] *Irvin v. Dowd*, 366 U.S. 717, 729-30; 81 S. Ct. 1639; 6 L. Ed. 2d 751 (1961) (Frankfurter, J., concurring) (emphasis added).

[17] This bombardment of adverse publicity has come from every direction (including radio, newspaper, television, online and social media, and public rallies), and is far too great in volume to capture here. An appendix summarizing less than 10% of this prejudicial news coverage is attached as **Exhibit B.**

1

bureaucrats, criminals, and racists sounds and feels like evidence. *It is not.* The repeated and seemingly authoritative statements from politicians, state prosecutors, professors, and plaintiffs' attorneys rebuking and calling for justice from Defendants (particularly the MDEQ Defendants) sounds and feels like evidence. *It is not.* The adverse findings and recommendations of politically-appointed investigative commissions casting blame on Defendants (particularly the MDEQ Defendants) sounds and feels like evidence. *It is not.* Such stories, statements, and findings are silent with respect to the plethora of readily available exculpatory evidence and are not likely admissible.

But the sensationalism has not been lost on state prosecutors and plaintiffs' attorneys who have taken full advantage of the local media's willingness to engage in mob journalism. Before commending the local media for doing a "great job" holding the MDEQ Defendants "accountable" and actually stating that the media is part of his "investigation team," state prosecutor, Todd Flood, told the jury pool that: "*There isn't a case that has jarred my soul more than this for the lack of caring, the lack of compassion, the lack of understanding that has affected these citizens here in Flint*." (*Id.* ¶ 199.)[18] Worse yet, on September 20, 2016, Michael Pitt, lead counsel for Plaintiffs in this case, gave a highly inflammatory interview on *Michigan Radio's* show "*Stateside*" where he described the MDEQ Defendants

---

[18] Ingham County Prosecutor and Democratic gubernatorial hopeful, Gretchen Whitmer, promptly questioned these tactics, explaining that: "*Prosecutors aren't supposed to be doing big press conferences and revealing strategy and making accusations in the press,*" because, *inter alia*, such antics "*can taint a potential jury pool.*" (*Id.* ¶ 246.)

2

as "criminals" and "racists," and then accused them of conducting an "experiment" with "poisonous" water on the "African American population in Flint." (*See* Pitt Interview Transcript, attached as **Exhibit C**.)

Not surprisingly, communities across the State (especially those making up this Judicial District) have exhibited strong emotional reactions. According to public opinion surveys conducted by Dr. Bryan Edelman, a leading expert in the field, over half of this Court's jury pool claims to have donated money or resources to help Flint. (*See* Edelman Declaration (Ex. A), ¶¶ 4, 45, 105.) Many others have resorted to displays of hostility, such as protests, heckling, graffiti, and absurd online comments wrongly directed toward the MDEQ Defendants. Indeed, Dr. Edelman's media analyses and public opinion surveys demonstrate that, without a single constitutional due process safeguard in place, the MDEQ Defendants have already been publically *charged* and *tried* by the local media's investigative reporting and *convicted* by a supermajority of the jury pool.

Dr. Edelman found that the Flint water crisis is one of the most heavily and negatively publicized events in the Country. (*Id.* ¶¶ 33-34.) His survey revealed that among potential jurors aware of the events in Flint: (a) **96%** had read, seen, or heard that children in Flint had been exposed to high levels of lead; (b) **71%** had read, seen, or heard about the civil lawsuits; and (c) **65%** had read, seen, or heard about the criminal charges. (*Id.* ¶¶ 47, 60, 61.) This empirical data shows that the "crisis" has "become seared in the public's consciousness" and, as the number of prejudicial articles grow, so does the prejudice within this Court's jury pool. (*Id.* ¶¶ 3, 16-31, 34.)

3

With respect to the "entrenched" bias saturating the community, Dr. Edelman's survey showed that among potential jurors aware of either the events in Flint and/or the lawsuits: **83%** already favor plaintiffs and believe that public officials acted with reckless disregard with **72%** stating that Defendants would have a "difficult time" *convincing them* otherwise; and **74%** already believe that damages should be awarded to punish the public officials named in the lawsuits. (*Id.* ¶¶ 3, 48-50, 57.) These survey results are "extremely alarming" and demonstrate that the burden of proof at trial would be "unfairly shifted to the defendants, who would have to prove that they were <u>not</u> grossly negligent," a "near impossible hurdle to overcome." (*Id.* ¶ 53.)

To protect Defendants' constitutional right to a fair trial, Dr. Edelman recommends, and the MDEQ Defendants request, that the Court follow the numerous federal court decisions cited below and exercise its general supervisory power to transfer this case to a venue untainted by the level of adverse publicity and indignation in this District and State. Alternatively, pursuant to 28 U.S.C. § 1404(a), the Court should transfer venue to the Northern Division of the United States District Court for the Western District because it is the least prejudicial venue in the State of Michigan. (*Id.* ¶¶ 6, 109, 114.)[19]

The MDEQ Defendants further request that the Court take action now. As the number of incendiary and biased news stories in Michigan continue to mount

---

[19] MDEQ Defendants are currently defending two related federal cases in the Western District's Southern Division. *See Nappier v. Snyder*, Case No. 1:16-cv-00636 (W.D. Mich.); *Anderson v. Snyder*, Case No. 1:16-cv-00874 (W.D. Mich.).

daily, so too does the prejudice level among potential jurors located throughout most of the State. These jurors are not likely to forget what they have read, seen, or heard. Waiting until the eve of trial, conducting what all evidence in hand now shows would result in a failed attempt to assemble a fair and impartial jury, and only then transferring this matter to a less prejudice venue, will only further prejudice the MDEQ Defendants and deprive the ultimate transferee court of the ability to manage the case leading up to and during trial.

## II.   ARGUMENT

### A.   A Change of Venue is Necessary to Protect Defendants' Constitutional Right to a Fair Trial by an Impartial Jury.

#### 1.   The United States Constitution Guarantees Civil Defendants a Fair Trial by an Impartial Jury.

The United States Constitution, through the due process clause of the Fifth Amendment and the right to a jury trial enshrined in the Sixth and Seventh Amendments, requires federal courts to give every defendant a fair trial whether in the criminal or civil arena. *See, e.g., Haley v. Blue Ridge Transfer Co.,* 802 F.2d 1532, 1535 (4th Cir. 1986) ("It is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the fact-finding process"); *Barnes v. Century Aluminum Co.,* 2013 U.S. Dist. LEXIS 66054, at *12 (D.V.I. May 9, 2013) (unpublished) ("[T]he constitutional imperative for a fair and impartial trial is equally applicable to civil actions as well as criminal actions") (**Exhibit L**).

5

Thus, even though this is a civil case, the MDEQ Defendants are constitutionally entitled to an impartial jury. *See, e.g., McCoy v. Goldston*, 652 F.2d 654, 657 (6th Cir. 1981) ("The right to an impartial jury in civil cases is inherent in the Seventh Amendment's preservation of a 'right to trial by jury' and the Fifth Amendment's guarantee that 'no person shall be denied of life, liberty or property without due process of law'"); *Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 514-15 (10th Cir. 1998) ("[T]he right to a jury trial in a civil case would be illusory unless it encompassed the right to an impartial jury").[20]

### 2.   Federal Courts Must Safeguard Defendants' Right to a Fair Trial by an Impartial Jury.

The Sixth Circuit has held that "[i]f pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury, the trial court should grant the defendant a change in venue." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007) (citation omitted); *see also Sheppard v. Maxwell*, 384 U.S. 333, 363; 86 S. Ct. 1507 (1966) (venue should be changed "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial"). Where a motion to change venue is brought prior to any attempt to empanel an impartial jury, it is adjudicated under the presumed-prejudice standard. *Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002) (citing *Murphy v. Florida*, 421 U.S. 794, 798; 95 S. Ct. 2031 (1975)).

---

[20] Even though the issue in *Skaggs* was governed by the Seventh Amendment, the Tenth Circuit found that "the reasoning of the Sixth Amendment cases concerning juror bias [was] germane to [its] analysis . . . ." 164 F.3d at 515 n.2. Accordingly, because civil and criminal defendants are both constitutionally entitled to a fair trial by an impartial jury, both civil and criminal cases addressing due process issues in the context of venue transfers are applicable here.

6

Under this standard, courts presume prejudice where adverse publicity causes a "wave of public passion" reaching levels where "jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031; 104 S. Ct. 2885 (1984). Such findings of presumed prejudice are rare. *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (citation omitted).

In addition to this constitutional standard, federal courts have broad supervisory authority under which a change of venue may be granted. *Marshall v. United States*, 360 U.S. 310, 312; 79 S. Ct. 1171 (1959) (federal courts have "a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial"). Cases construing this supervisory authority suggest that the threshold for unacceptable publicity triggering a change in venue may well be lower than under the constitutional presumed-prejudice standard described above. *See, e.g., United States v. Williams,* 568 F.2d 464, 469 (5th Cir. 1978) ("It is plain that the *Marshall* rule is considerably broader than the constitutional standard and provides more protection against prejudice"); *United States v. Tokars*, 839 F. Supp. 1578, 1581 (N.D. Ga. 1993) (finding that motions to change venue should be reviewed under the constitutional standard of *Murphy* and also under the supervisory standard of *Marshall* ).[21] Both standards are met here.

---

[21] *See also Skilling v. United States*, 561 U.S. 358, 446 n.9; 130 S. Ct. 2896 (2010) (Sotomayor, J., dissenting in part) (stating that the Court's supervisory powers confer "more latitude" to set standards for the conduct of trials in federal courts than in state courts); *Rideau v. Louisiana*, 373 U.S. 723, 729; 83 S. Ct. 1417 (1963) (Clark, J., dissenting) (noting that "there is a very significant difference between matters within the scope of our supervisory power and matters which reach the level of constitutional dimension").

3.    **The Adverse Publicity Pervading the State Jeopardizes Defendants' Right to a Fair Trial by an Impartial Jury.**

a.    **The Media Analyses and Public Opinion Surveys Show that a Change of Venue is Needed.**

"Statistical evidence or the results of opinion polls are often used to support a pre voir dire request for transfer." *N. Ind. Pub. Serv. Co. v. Envirotech Corp*., 566 F. Supp. 362, 365 (N.D. Ind. 1983) (citing cases).[22] In *Tokars*, 839 F. Supp. at 1581, for example, the court found that "[d]efendants' claims of pervasiveness of publicity and prejudicial effect of publicity [were] aided by [public opinion] survey results" which showed that 69% of respondents heard or read "a great deal" about the victim's murder and 66% had formed an opinion that the defendant was guilty of the murder. *Id.* at 1584. Based on these polling results and the "negative" nature of the publicity, the court concluded that "a sufficient presumption of prejudice exists to constitutionally *mandate* a change of venue." *Id.* (emphasis added).

By way of further example, in *United States v. Sablan*, 2014 U.S. Dist. LEXIS 175682, at *3-6 (E.D. Cal. Dec. 19, 2014) (unpublished) (**Exhibit M**), the district court ordered a change of venue based on: (a) news analyses showing "significant media coverage throughout the Fresno Division area from which the jury . . . would be drawn"; and (b) an opinion survey demonstrating that "60 percent of the venire has a source of bias against Defendant . . . ." *See also Williams v. Superior Ct.*, 34 Cal. 3d 584, 590 (1983) (directing trial court to

---

[22] *See also United States v. Gordon*, 380 F. Supp. 2d 356, 365 (D. Del. 2005) (change of venue required where polls showed that "almost everyone in [venue] heard about the case, and a substantial majority have already formed opinions about it").

transfer venue where only "one out of five [potential jurors] would not be able to give defendant a fair trial"); *People v. Boss*, 261 A.D.2d 1, 6 (N.Y. App. Div. 1st Dep't 1999) (change of venue required where 41% of potential jurors said the police were guilty of shooting the victim and 81% said there was no possible justification for the number of shots fired); *Commonwealth v. Cohen,* 489 Pa. 167, 187 (1980) (change of venue required where "nearly two-thirds of those jurors questioned had an opinion on guilt").

Here, media analyses and opinion surveys establish that the Court's jury pool has been so saturated with inflammatory publicity that to protect the Defendants' due process rights, the Court should transfer this case to another venue located in a different media market. (Ex. A ¶¶ 3-5, 91, 113.) *First*, the Westlaw "News" search of the principal newspapers in the Eastern District of Michigan for articles pertaining to the "Flint water crisis" produced an astounding number of results: (a) *Detroit Free Press*: 1,786 articles, (**Exhibit D** ); (b) *Flint Journal*: 1,368 articles, (**Exhibit E** ); and (c) *Detroit News*: 567 articles, (**Exhibit F**).[23] This unprecedented number of articles is 42 times higher than the median number of articles published in 52 cases where a change of venue was granted. Likely as a

---

[23] Similarly, Dr. Edelman's media analysis of *one* publication within the Eastern District (*i.e.,* the *Detroit Free Press*), confirmed that this case has "generated massive coverage, which has actually increased with the passage of time." (*See* Edelman Declaration (Ex. A) ¶¶ 31-33.) Dr. Edelman identified a total of 718 articles focused on this matter, a number over eight times higher than the median number of news articles (*i.e.,* 88.5) present in 52 cases where a change of venue was granted. (*Id.* ¶ 33.) An archive of the 718 *Detroit Free Press* articles identified by Dr. Edelman is attached as **Exhibit G**.

9

result, Dr. Edelman's public opinion survey of potential jurors in this District confirmed that: (a) **95%** have read, seen, or heard about the water situation in Flint; (b) **71%** have read, seen, or heard about the civil lawsuits; and (c) **65%** have read, seen, or heard about the criminal charges. (*Id.* ¶¶ 47, 60-61.)

Thus, by way of limited example, the juror recognition of this case: (a) rivals that in *People v. Taylor*, 113 Ill. App. 3d 467, 470 (1983), where the Illinois Court of Appeals found that "in large metropolitan area[s]," public polling showing that "98% of 382 people polled had heard of the case" and that "89% stated they had heard of it many times . . . illustrate[s] the pervasive effect of saturation news coverage," and (b) exceeds that in *Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005), where 87% of the jury pool recognized the case from media coverage.

*Second*, it cannot fairly be denied that the scores of articles reporting on the Flint water crisis have been and will continue to be highly prejudicial to the MDEQ Defendants. According to Dr. Edelman, "the nature of coverage surrounding this case incorporates the types of sensational and prejudicial reporting that can captivate the public's attention, generate anger, and lead to widespread bias in the jury pool." (*Id.* ¶ 41.) In the 718 articles he analyzed, the *Detroit Free Press* repeatedly described the matters at issue here in hyperbolic and highly prejudicial terms. (*Id.* ¶¶ 35-38.) Moreover, many of these articles stated that government officials knew about problems with the drinking water, failed to take basic protective measures, and then covered up what they knew. (*Id.* ¶ 39.)

*Third*, Dr. Edelman's public opinion survey confirmed that an overwhelming supermajority of this Court's jury pool already favor plaintiffs, already believe the

10

MDEQ Defendants acted with reckless disregard for public safety, already would have a difficult time being convinced otherwise, and already are inclined to award damages to punish the MDEQ Defendants. (*Id.* ¶¶ 42-66.) This finding was bolstered by the potential jurors' "qualitative" comments demonstrating an engrained prejudice held against the MDEQ Defendants. (*Id.* ¶ 55.) Based on this empirical data, Dr. Edelman stated that "the deep seeded prejudice found in the . . . jury pool represents the highest levels I have seen" and opined that if the case is not transferred "the burden of proof at the start of trial would be unfairly shifted to the defendants, who would have to prove that they were not grossly negligent." (*Id.* ¶¶ 46, 53.)

Because the prejudice levels tainting this Court's jury pool are significantly higher than the levels found in *Tokars*, *Sablan*, *Williams*, and *Boss*, the Court here should also transfer venue to protect the Defendants' constitutional right to a fair and impartial trial. As the Supreme Court long-ago instructed, "it is not requiring too much that [defendant] be tried . . . by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in [defendant's] guilt." *Irvin*, 366 U.S. at 728.

### b.    Local Media's Repeated Portrayal of Defendants' Statements as "Admissions" of Liability Requires a Change of Venue.

When a defendant's confession or admission of liability is featured in news media coverage, "a change of venue motion should be granted whenever requested" because "the voir dire process cannot cure the effect of a 'confession'

which has been given news media coverage." *Oliver v. State*, 250 So. 2d 888, 890 (Fla. 1971); *see also Rideau*, 373 U.S. at 724-26 (change of venue based on televised confession); *Neb. Press Ass'n v. Stuart,* 423 U.S. 1327, 1333; 96 S. Ct. 251 (1975) ("A prospective juror who has read or heard of the confession . . . repeatedly in the news may . . . be unable to form an independent judgment as to guilt or innocence"). The publications of purported confessions or admissions is one of the few contexts "in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135; 88 S. Ct. 1620 (1968).

In this case, the local media has repeatedly ran stories characterizing the inadmissible statements, resignations, and apologies of the Defendants -- as admissions of liability and wrongdoing. The jury pool has been saturated with reports that: (a) Defendant Snyder apologized for what he has since characterized as the "systematic failures" of "career bureaucrats" at the MDEQ; (b) Defendant Wyant resigned, apologized, and acknowledged that "mistakes" were made by MDEQ; and (c) Defendant Wurfel resigned, acknowledged mistakes, and then issued apologies to the people of Flint.[24] Because the mountain of adverse publicity

---

[24] This is in addition to a litany of seemingly authoritative statements and reports placing blame on the MDEQ Defendants. *See United States v. Moody*, 762 F. Supp. 1485, 1488 (N.D. Ga. 1991) (publicized observations of guilt by FBI agent justified a change of venue); *State v. Thompson*, 266 Minn. 385, 388 (1963) ("The vice of the publicity given this case is not in printing or disseminating factual news but in printing and broadcasting what purports to be the opinions of people who are supposed to know the facts").

in this case not only depicts the MDEQ Defendants as responsible for the "crisis,"
but also portrays them as having admitted responsibility, this matter is analogous to
cases where even brief publications of criminal confessions necessitated venue
changes. For this reason, alone, a change of venue is constitutionally required.

**c.    The Politicization of This Matter Requires a Change of Venue.**

"[L]egal trials are not like elections, to be won through the use of the
meeting-hall, the radio, and the newspaper." *Sheppard*, 384 U.S. at 350. "Political
factors have no place in a criminal proceeding, and when they are likely to appear
. . . they constitute an independent reason for a venue change." *Maine v. Superior
Ct.*, 68 Cal. 2d 375, 387 (1968); *see also Powell v. Superior Ct.*, 232 Cal. App. 3d
785 (1991) (change of  venue compelled by "the high level of political turmoil and
controversy" surrounding the Rodney King arrest).[25]

As more thoroughly discussed in the Motion, the politicization found in
these cases, where courts were constrained to transfer venue, pales in comparison
to the politicization of the Flint water "crisis." At every level of government, the
Flint water crisis has been marked by declarations of emergency, disputes over
public aid packages, raucous congressional hearings, fault-allocating investigative

---

[25] *See also Caldwell v. State*, 164 Tenn. 325, 332 (1932) (change of venue required
due to "very great excitement and public interest protracted by political agitation
and its attendant publicity"); *Pope v. State,* 126 Tex. Crim. 35, 38 (1934) change of
venue required where defendant's "official conduct had become a factor in
political campaigns"); *Smith v. Superior Ct.,* 276 Cal. App. 2d 145, 146-49 (1969)
(change of venue required where "investigative journalism" of bribery allegations
saturated the community and became "a cause *celebre* in local politics").

13

commissions, and remarkably uninformed finger-pointing from both sides of the political aisle, including presidential and gubernatorial contenders, federal and state legislators, and local officials.[26] Even more troubling is that the lowness of the political discourse largely concentrates on the allocation of blame (much of it mistakenly toward the MDEQ Defendants), and that all of it has been highly publicized by the local media.

Furthermore, the well-publicized activities of several authoritative-sounding committees and commissions in Michigan have been prejudicial to the MDEQ Defendants.[27] In particular, the Flint Water Advisory Task Force recently released a final report concluding that: (a) the MDEQ was primarily to blame for the Flint water situation, (b) MDEQ officials were "belligerent" and "intransigent," and (c) the situation amounted to environmental racism. (**Exhibit K**.) The report, of course, received enormous local media attention,[28] as well as elation from plaintiffs' attorneys, who attached it as an exhibit to their complaints. (*See* Dkt. No. 111-2.) For this reason, alone, venue should be transferred.

### d. The Local Community's Emotional Reaction Requires a Change of Venue.

A change of venue also been required where adverse publicity evokes a strong emotional response from the community. *See, e.g., Coleman v. Kemp*, 778

---

[26] *See* Ex. B ¶¶ 39, 110, 122-23, 141, 152, 172, 194, 204-16, 220-25, 228-29.

[27] *Id.* ¶¶ 4, 8-9, 13-14, 52, 54, 61, 63, 74-75, 77-78, 90, 92, 94, 101-02, 107, 165-79, 181-85, 190, 192, 195, 198, 202, 206-09, 217, 222-24, 228, 238, 241.

[28] *Id.* ¶¶ 4, 8, 13, 14, 54, 61, 75, 90, 92, 101, 170-72, 175, 178, 192, 195, 198, 203, 209, 215, 238, 242.

F.2d 1487 (11th Cir. 1985) ("[A]n atmosphere of hostility" pervaded community); *Woodford*, 428 F.3d 1181, 1211-12 ("[T]he public's response to publicity clearly amounted to a 'huge' wave of public passion"); *Boss*, 261 A.D.2d at 6 ("public clamor" including mass demonstrations attended by high-ranking present and former public officials); *Jacobs v. Commonwealth*, 870 S.W.2d 412, 415 (Ky. 1994) ("The force of adverse publicity gave impetus to the excitement and fostered prejudice among the people of the community"); *State v. James*, 767 P.2d 549, 554-55 (Utah 1989) ("[C]ommunity involvement brought many people much closer to this alleged crime than ordinarily occurs).[29]

One of the few federal cases in the Eastern District of Michigan to have transferred venue on the basis of widespread community hostility is *United States v. Ebens,* 654 F. Supp. 144, 146 (E.D. Mich. 1987). The *Ebens* Court was "compelled" to transfer venue where "the leadership of this community," including the Attorney General, Detroit City Council, Mayor of Highland Park, and a plethora of civil rights groups, had been "quoted by the news media uniformly to the effect that the defendant must be punished." The Court explained that:

> Factors such as the comment and castigation of public figures, the intensity and long duration of the publicity [], its inflammatory tone and content, and the continually repeated factual recitations, all militate toward the conclusion that a change of venue from the State of Michigan and the northern Ohio area must be granted." [*Id.*]

---

[29] *See also United State v. Maad,* 75 Fed. Appx. 599 (9th Cir. 2003) (unpublished) (**Exhibit N**); *Pamplin v. Mason*, 364 F.2d 1, 5 (5th Cir. 1966); *Johnson v. Beto*, 337 F. Supp. 1371, 1375-77 (S.D. Tex. 1972).

The same concerns are present here. As set forth more fully in the Motion, the widespread community support for the residents of Flint coupled with well-documented and visceral hostility directed toward the MDEQ Defendants by the local politicians, community leaders, residents, and civil rights groups equals and, in many ways, exceeds that present in *Ebens, James, Boss, Coleman,* and *Woodford*. The massive public and private humanitarian effort is well documented. (Ex. B ¶¶ 226-33.) Over half of this Court's jury pool states that they have donated money or resources to help Flint residents. (Ex. A ¶¶ 4, 45, 106.)

Additionally, a mob mentality has formed. Ann Arbor streets have been littered with "wanted posters" and "graffiti" expressing negative comments toward state officials, the Governor has been heckled at Ann Arbor establishments, and there have been several protests just blocks from the Courthouse. (*See* Ex. B ¶¶ 234-36, 239-40.) Such acts of community outrage are also common place in Flint. Protests have been attended by crowds in the thousands hoisting jugs of discolored water and displaying inflammatory signs calling for resignations, arrests, and justice. (*Id.* ¶¶ 158-59, 237-38, 241.) Much of the outrage has been directed at the MDEQ Defendants who have been the subject of shameful and wrongly-aimed personal attacks in the online comments following local news articles. (*Id.* ¶¶ 187-93, 242.) For these reasons, venue should be transferred.

16

### 4. Juror Prejudice Across Michigan is so Pervasive and Entrenched that Transfer to an Out-Of-State Venue is Required.

In some instances, adverse publicity may be so inflammatory and pervasive across an entire state that due process necessitates transfer of a case to an out-of-state venue. *See, e.g., Tokars*, 839 F. Supp. at 1581-82 ("local newspaper articles and local television reports literally have numbered in the thousands"); *United States v. Abrahams*, 453 F. Supp. 749, 751 (D. Mass. 1978) (media branded defendant as  a "con man" and "swindler"); *United States v. Mazzei*, 400 F. Supp. 17, 20 (W.D. Pa. 1975) (statewide perception that state senator violated the public trust); *United States v. Marcello*, 280 F. Supp. 510, 515-18 (E.D. La. 1968) (adverse publicity not likely read with as much interest by citizens of other states).

One prominent example of an out-of-state transfer occurred in the Oklahoma Bombing case of *United States v. McVeigh*, 918 F. Supp. 1467, 1469 (W.D. Okla. 1996). The court summarily determined that an impartial jury could not be empaneled in the Western District of Oklahoma where and thus weighed the propriety of transferring venue out of state. *Id.* at 1470-72. It found that while the national coverage of the bombing was initially intense, as time passed, "differences developed in both the volume and focus of the media coverage in Oklahoma compared with local coverage outside of Oklahoma . . . ." *Id.* at 1471. "The Oklahoma coverage was more personal, providing individual stories of grief and recovery," and "Oklahomans [were] united as a family." *Id.* It also found that the adverse publicity was more frequent in Oklahoma. *Id*. at 1473.

17

In transferring the case to the United States District Court for the District of Colorado, the court concluded "that there is so great a prejudice against these two defendants in the State of Oklahoma that they cannot obtain a fair and impartial trial at any place fixed by law for holding court." *Id.* at 1474. In so holding, the court emphasized that defendant's constitutional right to an impartial jury under the Sixth Amendment and the fundamental fairness requirement of the Fifth Amendment Due Process clause overrode "the place of trial provisions in both Article III and the Sixth Amendment." *Id.* at 1469.

In this case, Dr. Edelman has, in fact, opined that the prejudice infecting this Court's jury pool is unacceptable and on par with that which necessitated a change of venue in *McVeigh*. (Ex. A ¶ 3.) In the Oklahoma City Bombing cases **99%** of potential jurors were aware of the bombings and **83%** of potential jurors were biased against defendants. In this case, **95%** of this Court's jury pool is aware of the water situation in Flint and that **83%** of this Court's jury pool is biased against Defendants. (*Id.* ¶¶ 47, 50.) The numbers are no better in Grand Rapids where **99%** of potential jurors are aware of the water situation in Flint and that **81%** of potential jurors are biased against Defendants. (*Id.* ¶¶ 93-94.)

Also, like in *McVeigh,* where the court was constrained to order an out-of-state venue because "Oklahomans [were] united as a family with a spirit unique to the state," Dr. Edelman's survey here shows that Michiganders (especially in the lower peninsula) have united as a family to rally around the residents of Flint. (*Id.* ¶¶ 4, 105). The undeniable fact is that this matter has commanded a strong

18

following of Michigan residents because the events at issue occurred in Michigan, affected Michigan residents, and were allegedly caused by Michigan officials.

Accordingly, protection of Defendants' due process rights demands that these matters be transferred to an out-of-state venue. Selection of a less prejudicial venue is left to the Court's discretion and typically entails review of metropolitan areas with non-stop flight service, adequate community resources, and available federal court buildings. *See, e.g., Abrahams*, 453 F. Supp. at 753-54; *Moody*, 762 F. Supp. at 1490-91; *McVeigh*, 918 F. Supp. at 1474.

### 5.    The Court Should Not Defer Transfer of Venue.

The appropriate time for the transfer is now. There exists no good reason *voir dire* thousands of potential jurors in the hope of being able to cobble together an impartial jury. Numerous courts have expressed skepticism about jurors' assurances of impartiality in the face of vitriolic publicity. *See, e.g., Irvin*, 366 U.S. at 728 ("Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight"); *Goins v. McKeen*, 605 F.2d 947, 953-54 (6th Cir. 1979) ("The effect of exposure to extrajudicial reports on a juror's deliberations may be substantial even though it is not perceived by the juror himself, and a juror's good faith cannot counter this effect"); *Sablan*, 2014 U.S. Dist. LEXIS 175682, at *6-7 (finding "little assurance that even the most rigorous [*voir dire*] procedures would mitigate the apparently legitimate specter of bias or

19

prejudice to the process of a fair trial" where polls showed "actual bias in more than half the potential jury pool").[30]

In this case, there is more juror prejudice than in *Irvin*, *Goins,* and *Sablan*. Over a supermajority of this Court's jury pool already favor plaintiffs, believe that Defendants acted with reckless disregard for the public's safety, and want to award damage to punish Defendants. (Ex. A ¶¶ 48, 50, 57.) As explained by Dr. Edelman, "where there is massive media coverage and pervasive prejudice within the jury pool, *voir dire* does not serve as a reliable prophylactic measure for protecting defendant's due process rights." (*Id.* ¶ 66; *see also* ¶¶ 56, 67-91.) "[U]nder these unique circumstances, it strains credulity to assume that mere questionnaires and voir dire can effectively weed out biased residents." *In re Tsarnaev*, 780 F.3d 14, 38 (1st Cir. 2015) (Torruella, J., dissenting).

In the face of such overwhelming community-wide prejudice, several courts have also recognized that it is not an effective use of judicial resources to engage in the herculean task of calling and individually questioning an unwieldy number of veniremen in an attempt to empanel impartial juries. *See, e.g., Murphy*, 421 U.S. at 802; *United States v. Engleman*, 489 F. Supp. 48, 50 (E.D. Mo. 1980); *United*

---

[30] *See also United States v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990) ("Where a high percentage of the venire admits to a disqualifying prejudice, a court may properly question the remaining jurors' avowals of impartiality, and choose to presume prejudice"); *Delaney v. United States*, 199 F.2d 107, 112-13 (1st Cir. 1952) ("[T]he average juror is [not] so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity").

*States v. Lawson*, 2009 U.S. Dist. LEXIS 16032, at *3 (E.D. Ky. Mar. 2, 2009) (unpublished) (**Exhibit O**). Indeed, the *McVeigh* Court found that deferment of venue motions till the eve of trial are prejudicial because "a failed attempt to select a jury would, itself, cause widespread public comment." 918 F. Supp. at 1470. For these reasons, the Court should not delay transfer of venue.

### B. Alternatively, Transfer to the Northern Division of the Western District is Appropriate under 28 U.S.C. 1404(a).

Motions to transfer venue in civil cases are generally brought pursuant to 28 U.S.C. § 1404(a). In assessing transfer under 1404(a), courts evaluate whether: (1) the action could have been brought in the transferee district; (2) transfer serves the interest of justice; and (3) transfer is in the convenience of the witnesses and parties. *Kepler v. ITT Sheraton Corp.*, 860 F. Supp. 393, 398 (E.D. Mich. 1994); *see also Moses v. Bus. Card Exp., Inc.,* 929 F.2d 1131, 1137 (6th Cir. 1991). Within this framework, "[c]ourts have broad discretion." *Amphion, Inc. v. Buckeye Elec. Co.*, 285 F. Supp. 2d 943, 946 (E.D. Mich. 2003).[31]

It is, however, widely accepted that the "interest of justice" factor is the paramount consideration under 1404(a) and may, alone, dictate whether transfer is required. *See, e.g., Victaulic Co. v. E. Indus. Supplies, Inc.,* 2013 U.S. Dist. LEXIS 172021, at *4 (D.S.C. Dec. 6, 2013) (unpublished) (**Exhibit P**) ("[T]he interest of justice factor . . . may be decisive in ruling on a transfer motion, even though the convenience of the parties and witnesses point in a different direction"); *Bankers*

---

[31] This action could have been brought in the Western District of Michigan because Defendants Wyant and Wurfel, among others, reside there. *See Nappier v. Snyder*, *supra*; *Anderson v. Snyder*, *supra*.

*Trust Co. v. Crawford*, 559 F. Supp. 1359, 1363 (W.D.N.Y. 1983) ("The paramount consideration [under 1404(a)] is the interest of justice").[32]

In determining whether transfer is within the "interest of justice," courts must assess whether adverse publicity and resulting juror prejudice present obstacles to a fair trial. *See, e.g., West Am. Ins. Co. v. Potts*, 1990 U.S. App. LEXIS 12513, at *6 (6th Cir. July 25, 1990) (unpublished) (**Exhibit Q**); *Haase v. Gilboy*, 246 F. Supp. 594, 596 (E.D. Wis. 1965) (adverse publicity justified transfer of venue); *New York v. Gen. Motors Corp.*, 357 F. Supp. 327, 328 (S.D.N.Y. 1973) ("Adverse publicity is certainly a factor which a court may consider in determining the propriety of transfer pursuant to § 1404").

Thus, "[w]hen [a] trial judge becomes aware through massive news coverage that a fair trial cannot be had in the place where the action was filed, the judge has a duty to protect the defendant's rights to a fair trial." *Wash. Pub. Utilities Group. v. U.S. Dist. Court for W. Dist. of Wash.*, 843 F.2d 319, 326 (9th Cir. 1987) (citation omitted); Prophetically, the Mississippi Supreme Court in *Janssen Pharmaceutica, Inc. v. Bailey*, 878 So. 2d 31, 41-53 (Miss. 2004), cautioned that where suits are brought against public officials or involve mass tort actions, prosecutors  reveal inadmissible information, or separate claims become intertwined in the media, trial courts must be prepared to transfer venue.

---

[32] *See also Fein v. Pub. Serv. Coordinated Transp.*, 165 F. Supp. 370 (E.D. Pa. 1958) (same); *Hanning v. New England Mut. Life Ins. Co.*, 710 F. Supp. 213 (S.D. Ohio 1989) (same); *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559 (Fed. Cir. 1997) (same); *Bellomo v. United States*, 297 F. Supp. 2d 494 (E.D.N.Y. 2003) (same).

The advice applies here, where all of the above concerns, plus others, are present. As discussed in much more detail above, the prejudice levels here are simply extraordinary. The Court's jury pool has, for over a year now, been saturated with "24/7" publicity blaming Defendants for the "lead-poisoning of children" and depicting them as "incompetent bureaucrats," "criminals," and "racists." Such reports have been inaccurate and cavalierly treat complicated issues of water chemistry and interpretations of complex federal regulations as foregone conclusions. The communities making up this Judicial District have shown pronounced support for the residents of Flint and acted out in indignation against Defendants; calling for resignations, arrests, convictions, and worse. Furthermore, at least 83% of this Court's jury pool freely admits prejudice against the MDEQ Defendants. (Ex. A ¶¶ 48, 50, 57.)

Although Dr. Edelman recommends that this case be transferred to a venue outside of the State of Michigan because there are disturbing levels of prejudice pervading both the Eastern and Western Districts of Michigan, his data shows that the Northern Division of the Western District "represents the least prejudicial option available" in this State. (*Id.* ¶¶ 6, 109, 114.) The jury pool in the Northern Division "is less knowledgeable about prejudicial media reporting surrounding events in Flint, and less engaged in helping the residents there." (*Id.*) Only 20% of respondents from the Northern Division reported that they have donated money or resources to help Flint. (*Id.* ¶ 105.) And, only 10% felt that they or someone they knew personally had been impacted by the Flint water crisis. (*Id.* ¶ 104.)

23

Accordingly, if the Court is not inclined to transfer this case out of Michigan, it is in the interest of justice for this case, as well as all pending motions, to be transferred to the Northern Division of the Western District of Michigan. Where district courts are presented with both a motion to dismiss and a motion to transfer venue, they commonly address the venue motion first, and, where transfer is appropriate, leave the motion to dismiss to be decided by the transferee court. *See, e.g., Hoffman v. Fairfax Cnty. Redev. & Hous. Auth.*, 276 F. Supp. 2d 14, 17 (D.D.C. 2003) (transferee court better suited to address merits of motion to dismiss); *Brown v. New York*, 947 F.Supp.2d 317, 326 (E.D.N.Y. 2013) (deferring decision on motion to dismiss to allow the transferee court an opportunity to consider the merits of the case).

## III.   CONCLUSION

WHEREFORE, MDEQ Defendants respectfully request that this Honorable Court: (a) grant their Motion to Change Venue; (b) transfer this case to either an out-of-state venue where they are more likely to receive a fair trial or, alternatively, to the Northern Division of the United States District Court for the Western District of Michigan; and (c) award them any different or further relief this Court deems equitable and just.

Dated:  October 21, 2016

Foster, Swift, Collins & Smith, P.C.
Attorneys for Defendants Patrick
Cook, Michael Prysby, and Adam
Rosenthal

By:  */s/ Charles E. Barbieri*
   (with permission)
   Charles E. Barbieri (P31793)
   313 S. Washington Sq.
   Lansing, MI 48933
   (517) 371-8100
   cbarbieri@fosterswift.com

Clark Hill PLC
Attorneys for Defendants Daniel
Wyant and Bradley Wurfel

By:  */s/ Michael J. Pattwell*
   Michael J. Pattwell (P72419)
   212 E. Grand River Ave.
   Lansing, MI 48906
   (517) 318-3043
   mpattwell@clarkhill.com

Respectfully submitted,

Fraser, Trebilcock, Davis & Dunlap
Attorneys for Defendant Liane
Shekter Smith

By:  */s/ Thaddeus E. Morgan*
   (with permission)
   Thaddeus E. Morgan (P47394)
   124 W. Allegan St., Ste. 1000
   Lansing, MI 48933
   (517) 482-5800
   tmorgan@fraserlawfirm.com

Kotz Sangster Wysocki, P.C.
Attorneys for Defendant Stephen Busch

By:  */s/ Philip A. Grashoff, Jr.*
   (with permission)
   Philip A. Grashoff, Jr. (P14279)
   36700 Woodward Ave., Ste. 202
   Bloomfield Hills, MI 48304
   (248) 646-1050
   pgrashoff@kotzsangster.com

25

## INDEX OF EXHIBITS

A.    October 9, 2016 Declaration of Bryan Edelman with Appendices.

B.    Appendix Summarizing Prejudicial Coverage of the Flint Water Crisis.

C.    Transcript of Attorney Michal Pitt's September 20, 2016 Interview with *Michigan Radio.*

D.    List of the *Detroit Free Press's* Flint Water Articles from April 24, 2014 to September 26, 2016.

E.    List of the *Flint Journal's* Flint Water Articles from April 24, 2014 to September 26, 2016.

F.    List of the *Detroit News'* Flint Water Articles from April 24, 2014 to September 26, 2016.

G.    Archive of the 718 *Detroit Free Press* Articles.

H.    List of the *Kalamazoo Gazette's* Flint Water Articles from April 24, 2014 to September 26, 2016.

I.    List of the *Traverse City Record Eagle's* Flint Water Articles from April 24, 2014 to September 26, 2016.

J.    Archive of the *Grand Rapids Press's* Flint Water Articles from January 29, 2015 to September 26, 2016.

K.    Flint Water Advisory Task Force March 2016 Final Report.

L.    *Barnes v. Century Aluminum Co.,* 2013 U.S. Dist. LEXIS 66054 (D.V.I. May 9, 2013) (unpublished).

M.    *United States v. Sablan*, 2014 U.S. Dist. LEXIS 175682 (E.D. Cal. Dec. 19, 2014) (unpublished).

N.    *United State v. Maad,* 75 Fed. Appx. 599 (9th Cir. 2003) (unpublished).

O.    *United States v. Lawson*, 2009 U.S. Dist. LEXIS 16032 (E.D. Ky. Mar. 2, 2009) (unpublished).

P.    *Victaulic Co. v. E. Indus. Supplies, Inc.,* 2013 U.S. Dist. LEXIS 172021 (D.S.C. Dec. 6, 2013) (unpublished).

Q.    *West Am. Ins. Co. v. Potts*, 1990 U.S. App. LEXIS 12513 (6th Cir. July 25, 1990) (unpublished).

R.    *Dakota Hotel Ventures, LLC v. David Baumann-Architect, Ltd.,* 2016 U.S. Dist. LEXIS 26497 (D.S.D. Mar. 2, 2016) (unpublished).

26

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2016, I electronically filed the above with the Clerk of Court using the CM/ECF System, which will provide electronic copies to counsel of record.

*s/ Michael J. Pattwell*

27